# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MANICHAEAN CAPITAL, LLC,               )
CHARLES CASCARILLA, EMIL KHAN          )
WOODS, LGC FOUNDATION, INC., and       )
IMAGO DEI FOUNDATION, INC.             )
                                       )
                Petitioners,           )
                                       )
        v.                             )        **C.A. No. 2017-0673-JRS**
                                       )
SOURCEHOV HOLDINGS, INC.,              )
                                       )
                Respondent.            )


## MEMORANDUM OPINION

Date Submitted:  October 31, 2019
Date Decided:  January 30, 2020


Rudolf Koch, Esquire and Matthew W. Murphy, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware and Samuel J. Lieberman, Esquire and Michelle Malone, Esquire of Sadis & Goldberg LLP, New York, New York, Attorneys for Petitioners.

T. Brad Davey, Esquire, Matthew F. Davis, Esquire, Andrew H. Sauder, Esquire and Caneel Radinson-Blasucci, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware, Attorneys for Respondent.


**SLIGHTS, Vice Chancellor**

SourceHOV Holdings, Inc. ("SourceHOV" or the "Company") executed a series of transactions in 2017 that converted certain of its minority stockholders into unitholders of a limited liability company. These transactions facilitated a three-party business combination between SourceHOV, Novitex Holding Inc. ("Novitex") and Quinpario Acquisition Corp. 2 ("Quinpario") wherein SourceHOV merged into Quinpario and became a publicly traded company (the "Business Combination"). Petitioners were SourceHOV minority stockholders. The Business Combination triggered their appraisal rights under 8 *Del. C.* § 262, which they now seek to exercise.

In the wake of recent guidance from our Supreme Court, this Court typically begins its statutory appraisal function by focusing on market-based evidence of fair value.[1] In this case, however, the parties agree that market evidence is not useful because SourceHOV was privately held and its managers made no real effort to run a "sale process" in advance of the Business Combination. Accordingly, the parties rely on traditional valuation methodologies, as presented by their experts, to advance their divergent views of SourceHOV's fair value. After completing their valuation analyses based on several approaches, the experts agree that a discounted cash flow

---

[1] *See DFC Global Corp. v. Muirfield Value P'rs, L.P.*, 172 A.3d 346 (Del. 2017); *Dell, Inc. v. Magnetar Global Event Driven Master Fund Ltd.*, 177 A.3d 1 (Del. 2017); *Verition P'rs Master Fund Ltd. v. Aruba Networks, Inc.*, 210 A.3d 128 (Del. 2019).

analysis ("DCF") is the most reliable tool to determine SourceHOV's fair value. Of course, they disagree on multiple crucial inputs in their DCF analyses, and these disagreements have placed the Court in the now familiar position of grappling with expert-generated valuation conclusions that are solar systems apart. Good times. . . .

Petitioners' expert calculates SourceHOV's fair value at $5,079 per share; Respondent's expert sets the fair value mark at $2,817 per share. While frustrating, the fact that appraisal experts so profoundly disagree on what is, in essence, a fixed point is no longer surprising.[2] If that were as far as the disagreements went, this appraisal dispute would not be particularly remarkable. But this case comes with a twist. Not only does Respondent disagree with Petitioners' expert, it disagrees with its *own expert*—it has rested on a fair value for SourceHOV ($1,633 per share) that comes in well below even its own expert's appraisal.

The evidentiary framework for appraisal litigation, while strange, is well settled. Both sides have the burden of proving their respective valuation positions by a preponderance of evidence. If the parties fall short in meeting their respective

---

[2] *See, e.g.*, *Golden Telecom, Inc. v. Global GT LP*, 11 A.3d 214, 218 (Del. 2010) ("[I]t is difficult for . . . Vice Chancellors to assess wildly divergent expert opinions regarding value."); *In re Appraisal of Jarden Corp.*, 2019 WL 3244085, at *1 (Del. Ch. July 19, 2019) (observing that well credentialed experts were "miles apart"); *Gonsalves v. Straight Arrow Publ'rs, Inc.*, 1996 WL 696936, at *1 (Del. Ch. Nov. 27, 1996) ("*Gonsalves I*"), *rev'd*, 701 A.2d 357 (Del. 1997) ("*Gonsalves II*") (stating it is "rather a typical appraisal trial" when experts advance "absurdly differing values").

burdens, then the court must sift through the evidence to perform its own appraisal.[3]

After carefully considering the evidence, I am satisfied that I need not undertake my own appraisal of SourceHOV. Petitioners' expert, with one minor exception, has presented a credible valuation analysis from which I see no legal or evidentiary basis to depart. In other words, I have more confidence in Petitioners' presentation than I have in my own ability to translate any doubts I may have about it into a more accurate DCF valuation.

After reviewing Respondent's fair value presentation, I am struck by the fact that it has disagreed with its own valuation expert, relied on witnesses whose credibility was impeached and employed a novel approach to calculate SourceHOV's equity beta that is not supported by the record evidence. In a word, Respondent's proffer of fair value is incredible.

With these factual conclusions in hand, I have determined the fair value of SourceHOV's stock at the time of the Business Combination was $4,591 per share. I explain my reasons below.

---

[3] *M.G. Bancorporation, Inc. v. LeBeau*, 737 A.2d 513 (Del. 1999).

# I. FACTUAL BACKGROUND

The following facts were proven by a preponderance of the credible evidence after a three-day trial.[4]

## A. Parties and Relevant Non-Parties

Respondent, SourceHOV, was a Delaware corporation with its principal place of business in Irving, Texas.[5] It provided process outsourcing and financial technology services within several industries.[6]

Petitioners, Manichaean Capital, LLC, Charles Cascarilla, Emil Khan Woods, LGC Foundation, Inc. and Imago Dei Foundation, Inc. (collectively "Manichaean") owned 3,574, 4,418, 2,024, 205 and 83 shares of SourceHOV common stock, respectively, as of the Business Combination.[7] Manichaean received its 10,304 shares—about 6.5% of SourceHOV's common stock—in February 2014 when

---

[4] The trial record consists of testimony from 15 fact witnesses, 2 expert witnesses and more than 450 trial exhibits. *See* Stipulated Joint Pre-Trial Order at Ex. A ("PTO") (D.I. 81); Pet'rs' Notice of Lodging (D.I. 86). Citations will appear as follows: "PTO __" will refer to stipulated facts in the Pretrial Order; "Tr. __ ([Name])" will refer to witness testimony from the trial transcript; "JX __" will refer to the trial exhibits; and "([Name]) Dep. (JX __ or D.I. __)" will refer to witness testimony from a deposition transcript lodged with the Court for trial.

[5] PTO ¶ 7.

[6] *Id.*; Tr. 305:23–306:2 (Chadha).

[7] PTO ¶¶ 1–5.

SourceHOV acquired BancTec Group ("BancTec").[8]  In total, Petitioners invested about $32 million in SourceHOV.[9]

Non-party, HandsOn Global Management, LLC ("HGM"), is a family investment business operated by non-party, Parvinder Chadha ("Chadha"), who served as HGM's CEO and Chief Investment Officer.[10]  Chadha founded HGM in 2001 "to invest [his] . . . personal capital in [order to] build [a] business process services company that acquired technology."[11]  HGM and its affiliates held about 80% of SourceHOV's common stock.[12]  Its investment in SourceHOV traces back to 2007, when HGM acquired SourceHOV's predecessor entity, HOV Services LLC.[13]

---

[8] *Id.*; JX 265 at 270 (providing the BancTec acquisition background); JX 274 at 35–38 (showing SourceHOV's ownership as of June 30, 2017).

[9] Tr. 450:7–11 (Cascarilla).

[10] PTO ¶ 9.

[11] Tr. 304:11–14 (Chadha).

[12] PTO ¶¶ 10–11; Tr. 368:20–23 (Chadha).

[13] Tr. 304:18–20 (Chadha); JX 265 at 270.

Chadha works at HGM with non-party, Jim Reynolds, a CPA who serves as HGM's COO.[14] Together, Chadha and Reynolds functionally comprised the SourceHOV board of directors (the "SourceHOV Board").[15]

Non-party, Apollo Global Management, LLC ("Apollo"), is a global investment firm.[16] Apollo was a majority stockholder of Novitex, a participant in the Business Combination.[17]

Non-party, Delos Capital Management, LP ("Delos"), is a private equity and venture capital firm.[18] Delos was an investor in SourceHOV.[19]

## B. SourceHOV's Origins, Growth and Governance

SourceHOV was formed in April 2011 through the combination of two process outsourcing service providers.[20] In November 2014, SourceHOV acquired BancTec, which expanded SourceHOV's business automation services into the

---

[14] Tr. 519:8–10 (Reynolds).

[15] Chadha was Chairman and Reynolds Co-Chair of the SourceHOV Board. *See* PTO ¶¶ 10–11.

[16] *Id.* ¶ 17.

[17] *Id.*

[18] *Id.* ¶ 22.

[19] *Id.*

[20] JX 265 at 246.

banking and payments industry.[21]  Upon consummation of the BancTec transaction, Manichaean's BancTec investment rolled into SourceHOV and Manichaean became SourceHOV's second largest, non-HGM affiliated investor.[22]

SourceHOV continued to grow through acquisitions.  In 2016, it acquired TransCentra, Inc. ("TransCentra"), a provider of remittance transaction processing services.[23]  That transaction, like the BancTec transaction before it, left SourceHOV in a highly leveraged state.[24]

By the time of the Business Combination, SourceHOV had grown into a global business process outsourcing and financial technology company with a work force of 16,000 employees.[25]  It provided information and transaction processing solutions to clients in three major industry segments: (i) Information and Transaction Processing Solutions ("ITPS"); (ii) Healthcare Solutions ("HS") and (iii) Legal and Loss Prevention Services Solutions.[26]  In 2015 and 2016, SourceHOV generated

---

[21] *Id.* at 270; Tr. 305:10–13 (Chadha).

[22] JX 274 at 36–38.

[23] JX 265 at 270–71, 397; Tr. 115:3–5 (Verma).

[24] Tr. 306 (Chadha).

[25] JX 265 at 32, 260, 396.

[26] *Id.* at 396.

7

roughly $800 million in "recurring" revenue,[27] meaning that approximately 90% of its revenues flowed from long-term client contracts.[28]

SourceHOV's governance structure was not a model for best practices. Its Board appears to have comprised two members—Chadha and Reynolds—both of whom were nominated by HGM.[29] While minority investors (including Manichaean) had information rights, SourceHOV went years without holding a Board meeting, and Manichaean seldom received SourceHOV's financial statements.[30]

## C. The 2014 BancTec Acquisition and Future Debt/EBITDA Ratio Stepdowns

In connection with the 2014 BancTec acquisition, SourceHOV raised debt in two separate agreements: the First Lien Credit Agreement (the "First Lien") and the Second Lien Credit Agreement (the "Second Lien").[31] The First Lien included both

---

[27] *Id.* at 392.

[28] *Id.* at 270.

[29] Tr. 14–15 (Verma) (stating that Chadha and Reynolds were the SourceHOV Board members who reviewed management's projections); Tr. 265–66 (Chadha) (expressing confusion over whether Delos had a Board seat); PTO ¶¶ 10 (stipulating that Chadha was Chairman of the SourceHOV Board), 11 (stipulating that Jim Reynolds was Co-Chairman of the SourceHOV Board). At trial, Chadha, the nominal Chairman of the SourceHOV Board, was unable to say for sure who the other Board members were. Tr. 266 (Chadha).

[30] JX 42; JX 414 at 72; Tr. 450, 452–55 (Cascarilla).

[31] JX 6 (the "First Lien"); JX 7 (the "Second Lien").

a $780 million term loan and $75 million in revolving credit.[32] It carried a coupon rate of 7.75% and was due in October 2019, with required quarterly payments on principal at .625% for the first year and 1.25% thereafter.[33] The Second Lien included a $250 million term loan with an 11.5% coupon rate due in April 2020.[34] Because they were issued at a discount to par, the weighted average yield to maturity of the First and Second Liens at issuance was 9.5%[35] The First and Second Liens remained outstanding until the Business Combination and constituted the "vast majority" of SourceHOV's outstanding debt.[36]

The First and Second Liens contained covenants requiring SourceHOV to maintain a defined leverage ratio, with a numerator of total net debt and a denominator of a specified measure of EBITDA (the "Leverage Ratio").[37] The Leverage Ratio was initially 6.375x with scheduled "stepdowns" every six months.[38]

---

[32] First Lien at 6 (Recitals).

[33] *Id.* § 2.11(a)(i); JX 357.

[34] Second Lien at 7 (Recitals).

[35] Meinhart Dep. (D.I. 87) 72:16–73:12.

[36] PTO ¶ 29.

[37] *See* Tr. 82:12–83:21 (Verma). The Leverage Ratio uses a measure of EBITDA ("adjusted EBITDA"), defined on a "Pro Forma Basis," and includes certain adjustments. *See* First Lien §§ 1.01, 6.10; Second Lien §§ 1.01, 6.10.

[38] First Lien § 6.10; Second Lien § 6.10.

Under the designated schedule, the Leverage Ratio had to be reduced to 4.75x and then 4.25x by the end of December 2016 and June 2017, respectively.[39] Because the Leverage Ratio depends on the relationship between debt and EBITDA, SourceHOV would either have to increase its EBITDA, reduce its total debt or both to satisfy the Leverage Ratio covenant.[40]

Under both the First and Second Liens, SourceHOV was required to certify its compliance with the Leverage Ratio at regular intervals.[41] If SourceHOV failed to satisfy the Leverage Ratio, it would be in default, and its repayment obligations would be accelerated, unless cured.[42] The cure right allowed SourceHOV "a period in which it [could] bring in contributions from shareholders' equity, . . . and add that to the EBITDA."[43]

### D. The 2016 TransCentra Acquisition and the Novitex/Quinpario Letter of Intent

By September 2016, SourceHOV had acquired TransCentra.[44] Two months later, it turned its sights to Novitex, a provider of document management services.

---

[39] First Lien § 6.10; Second Lien § 6.10.

[40] Tr. 86:9–12 (Verma).

[41] First Lien § 5.04(c); Second Lien § 5.04(c); Tr. 90:9–20 (Verma).

[42] First Lien §§ 7.01–7.02; Second Lien §§ 7.01–7.02.

[43] Tr. 88:11–15 (Verma).

[44] JX 265 at 397.

At first, SourceHOV considered an all-cash acquisition of Novitex and engaged Millco Advisors, LP ("Millstein") to assist with securing financing.[45] By January 3, 2017, however, SourceHOV had decided to pursue a different structure, a merger, with new financial advisors, Rothschild, Inc. ("Rothschild") and Morgan Stanley & Co., LLC ("Morgan Stanley").[46] There were two main reasons for the change in the acquisition strategy. *First*, SourceHOV did not want to pursue the "significant additional equity infusion" that would be required for an all-cash acquisition, nor did it want to pursue a change of control transaction.[47] *Second*, a merger with a publicly traded company would provide SourceHOV with greater liquidity and access to public markets for future financing.[48]

Given these factors, Rothschild suggested that SourceHOV pursue the Business Combination among SourceHOV, Novitex and Quinpario rather than an all-cash acquisition.[49] Quinpario was a NASDAQ-listed, blank-check, special

---

[45] PTO ¶¶ 35, 36; JX 63 (Millstein engagement letter dated November 1, 2016).

[46] PTO ¶¶ 25, 27, 41.

[47] JX 265 at 172–73; Tr. 215 (Chadha) (confirming that Rothschild proposed a transaction through which HGM retained majority control of any SourceHOV/Novitex combined entity).

[48] PTO ¶ 41.

[49] *Id.*

purpose acquisition company ("SPAC") formed to find a merger opportunity.[50] The initial plan was for SourceHOV and Novitex to roll all of their equity interests, along with at least $225 million of Quinpario's cash, into Quinpario, which would then be renamed Exela.[51]

Investors in SPACs like Quinpario have the right to require the SPAC to redeem their shares rather than roll their shares into a post-acquisition company.[52] This dynamic can result in last-minute re-negotiations of SPAC deals when there are more redemptions than anticipated.[53] Quinpario had $350 million in cash to deploy for a potential transaction, but the fund was set to expire on January 22, 2017, at which point, absent an extension approved by its investors, it would return that cash to its investors and wind up.[54] With its sunset looming, Quinpario needed to move quickly.

On January 13, 2017, SourceHOV, Novitex and Quinpario signed a letter of intent (the "LOI") memorializing their initial plan for the Business Combination.[55]

---

[50] *Id.* ¶ 20.

[51] JX 117 at 3–4; PTO ¶ 19.

[52] *See* JX 265 at 143.

[53] JX 11 at 8.

[54] JX 104 at 6.

[55] JX 115; JX 117.

According to the LOI, SourceHOV, Novitex and Quinpario would all combine, and SourceHOV stockholders would receive between 53% and 58% of Exela's stock.[56] Together, SourceHOV and Novitex stockholders would own approximately 77% of Exela.[57] Quinpario would contribute between $225 and $350 million in exchange for about 17% of the remaining stock.[58] The LOI contemplated a total enterprise value for Exela of approximately $3.1 billion.[59]

### E. The First and Second Liens Cause Liquidity Pressure

During 2016 and early 2017, before SourceHOV signed the LOI, SourceHOV faced stepdowns for the Leverage Ratio under the First and Second Liens.[60] The stepdowns posed particular challenges because SourceHOV had experienced flat top-line revenue for at least the past two years.[61] These trends required SourceHOV to juggle liquidity issues at the same time it was negotiating the Business Combination.[62]

---

[56] JX 117 at 5.

[57] *Id.*

[58] *Id.*

[59] *Id.* at 3.

[60] First Lien § 6.10.

[61] JX 395 at 13, 45; JX 265 at 68; JX 292.

[62] JX 10 at 1–2.

Historically, SourceHOV had a strong record of meeting or exceeding its revenue projections. On April 1, 2013, SourceHOV presented a set of projections to rating agencies predicting its income each year until 2015.[63] In 2013, 2014 and 2015, SourceHOV exceeded those projections—showing annual growth rates of 10%, 12.8% and 23.7%, respectively.[64] A July 2017 "Roadshow Presentation," circulated just four days before the Business Combination, disclosed a cumulative annual growth rate of 10.1% between 2014 and March 31, 2017.[65] But that same presentation disclosed that SourceHOV's "core business" had been mostly "steady."[66] SourceHOV's "key drivers" for the future depended on acquisitions that would enable the Company to grow through cross-selling, synergy realization, a shift to higher-margin products and a reduction in operating leverage.[67] As the Roadshow Presentation hinted, SourceHOV did not grow as fast as expected in 2015 and 2016.

---

[63] JX 393 at 63.

[64] *Id.* at 13, 45 (showing SourceHOV's actual results for 2013); JX 265 at 68 (showing SourceHOV's actual results for 2014 and 2015); JX 393 at 63 (showing SourceHOV's 4/1/14 Rating Agency Presentation multi-year projections).

[65] JX 275 at 35.

[66] *Id.*

[67] *Id.* at 24.

Indeed, the Roadshow Presentation acknowledged that the ITPS segment's top-line revenue had "remained stable" since 2014.[68]

Debt rating agencies noticed these trends. Shortly after the BancTec acquisition in 2014, Moody's gave SourceHOV a corporate family rating of B2 and rated the First and Second Liens at B1 and Caa1, respectively.[69] A year later, Moody's downgraded SourceHOV to B3 and the First and Second Liens to B2 and Caa2, respectively, based on revenue and earnings shortfalls.[70]

Moody's ratings changes reflected liquidity pressure created by the Leverage Ratio stepdowns as well as SourceHOV's recent revenue stagnation.[71] To compound the liquidity pressure, the First and Second Liens stepped up their required amortization payments in 2015.[72] With these trends unfolding, cash generation became a key priority for SourceHOV.[73]

---

[68] *Id.* at 31 (noting "Topline Trends" for the ITPS segment: "[c]ore revenue, which has remained stable during 2014–16, is poised for growth.").

[69] JX 4.

[70] JX 10.

[71] *Id.*

[72] First Lien § 2.11(a)(i); JX 205 at 10 (statement of cash flows showing SourceHOV's principal payment obligations from 2014 through 2016).

[73] Tr. 219 (Chadha).

On May 3, 2016, Moody's again downgraded the First and Second Liens to B3 and Caa3 respectively—noting SourceHOV's weak liquidity position.[74] Three months later, Standard & Poor's followed suit—downgrading the First Lien to CCC+ and the Second Lien to CCC-.[75]

Consistent with past practice, SourceHOV looked to increase its revenue through acquisitions. In September 2016, SourceHOV alleviated some pressure when it acquired TransCentra. The TransCentra acquisition was a "de-leveraging" transaction because TransCentra had a much lower leverage ratio than SourceHOV.[76] Following the TransCentra deal, SourceHOV's total Leverage Ratio decreased from 5.341x to 5.235x at the end of Q3 2016.[77] But SourceHOV still had more work to do because it needed to bring its Leverage Ratio down to 4.75x by the end of 2016, around the same time SourceHOV negotiated the LOI.[78]

Management projections showed SourceHOV would meet its Leverage Ratio goal if it "execut[ed] exactly according to the business plan," but there was little

---

[74] JX 12.

[75] JX 30 (noting SourceHOV's "tight covenant cushion, upcoming maximum leverage stepdowns, and less-than-adequate liquidity[]").

[76] Tr. 93 (Verma); JX 66 at 2; JX 30 (Standard & Poor's noted that SourceHOV could improve its covenant cushion percentage by "closing on the TransCentra acquisition.").

[77] Tr. 93 (Verma); JX 66 at 2.

[78] First Lien § 6.10.

room for error.[79]  As year-end 2016 approached, SourceHOV determined that it needed a small equity infusion to meet the required Leverage Ratio.[80]  In September, four months before signing the LOI, SourceHOV sought a $23 million investment from existing equity stockholders including HGM, Delos and Manichaean.[81]  The offer was for $1,600 per share, valuing SourceHOV's equity at $231 million.[82]

SourceHOV's offer triggered matching rights for Manichaean that it could have exercised to invest at the $1,600 per share price.[83]  It was reluctant to make the investment, however, because it had limited information about SourceHOV and no expectation that SourceHOV management would suddenly open the information pipeline.  Manichaean acknowledged that SourceHOV had "significant upside on the [] equity" but was concerned by the "lack of reliable transparency in terms of general business prospects (management updates, dissemination of financials) and governance (e.g., lack of any board meetings)."[84]  Indeed, Manichaean's managing partner, Charles Cascarilla, had been complaining since September 2016 that

---

[79] Tr. 94 (Verma).

[80] Tr. 94–96 (Verma).

[81] JX 35.

[82] *Id.* at 27.

[83] *Id.* at 1; JX 82.

[84] JX 82 at 1; Tr. 452 (Cascarilla) (Manichaean never received unaudited financial statements.).

17

SourceHOV had not held a board meeting in the two years since Manichaean became a minority owner.[85]  Cascarilla was so frustrated, in fact, that he considered selling his interest in SourceHOV to Delos without having any real sense of what that interest was worth.[86]

Ultimately, Delos and HGM invested $9 million around January 2017.[87] SourceHOV used $6 million of the new equity to "cure" its shortfall and meet the required Leverage Ratio stepdown under the First and Second Liens.[88]

Manichaean initially declined to participate in the equity raise.  But after Manichaean had the chance to "see presentations . . . about how [SourceHOV] was performing" and "assess whether or not [to] participat[e] on a pro rata basis, so [Manichaean] [would not be] diluted down," Manichaean agreed to invest an additional $1.5 million on February 8, 2017.[89]

---

[85] JX 42 (Cascarilla expressing his frustration that "it's hard to think of a company of this size ($1.3bn EV) with such poor governance and communication" and "[w]e keep waiting to be treated as partners, but that is not happening"); Tr. 447 (Cascarilla).

[86] JX 79; JX 82; JX 83.

[87] JX 155; JX 120; Tr. 522–24 (Reynolds).  Delos invested $5 million on January 20, 2017 and HGM made a separate $4 million investment in late December 2016.  JX 155; JX 120; Reynolds Dep. (D.I. 87) 36:7–15; Chadha Dep. (D.I. 86) 285 (tab 2).

[88] JX 205 at 59.

[89] Cascarilla Dep. (D.I. 86) 82, 84–85; JX 155; Tr. 497–98 (Cascarilla).  Testimony from Cascarilla credibly explains that Manichaean's frustration with the lack of information made Manichaean reluctant to invest more into SourceHOV.  Cascarilla Dep. (D.I. 86) 82–85; Tr. 500 (Cascarilla).  That changed when "other firms that had access to information"

The combination of the TransCentra acquisition and the equity investment alleviated enough liquidity pressure to allow SourceHOV to focus on the Business Combination. SourceHOV certified in a March 14, 2017 Going Concern Memorandum that it did not "anticipate any defaults" in 2017.[90] The debt rating agencies apparently agreed that a default was unlikely, as they did not downgrade SourceHOV's debt between September 2016 and the Business Combination.[91]

## F. The Business Combination Agreement

As noted, Quinpario stockholders were entitled to exercise redemption rights and withdraw their investments before the Business Combination closed, and the fund was set to wind up on January 22, 2017.[92] With negotiations relating to the Business Combination in full swing, Quinpario's stockholders approved an extension of the wind up to July 24, 2017.[93] While the extension allowed more time for negotiations, it also allowed more time for redemptions. By the time the parties were prepared to consummate the Business Combination, more than 14 million shares of Quinpario stock had been redeemed, leaving just $200 million in

---

(i.e., Quinpario) announced that SourceHOV's equity was worth $806 million. Tr. 500 (Cascarilla).

[90] JX 191 at 15.

[91] Tr. 223–24 (Chadha).

[92] JX 265 at 143; JX 104 at 6.

[93] JX 265 at 176.

Quinpario's trust account.[94]   And Quinpario stockholders would have another opportunity to demand redemption in connection with the ultimate vote to approve the Business Combination.[95]   Thus, it became clear to all that Quinpario would bring less cash to the table than originally anticipated in the LOI.

On February 21, 2017, SourceHOV, Novitex, Quinpario and other entities executed the Business Combination Agreement (the "BCA").[96]   Under the BCA, and as contemplated by the LOI, both SourceHOV and Novitex would merge into separate wholly-owned Quinpario subsidiaries.[97]   Quinpario would then assume the name Exela.[98]   SourceHOV and Novitex stockholders would roll over all of their equity into Exela.[99]   Quinpario and other private ("PIPE")[100] investors would contribute $200 million and ~$75 million, respectively, for their shares.[101]   Crucially,

<hr>

[94] *Id.*

[95] *Id.* at 143.

[96] JX 169.

[97] JX 265 at 2–3, 133; JX 173.

[98] JX 173; PTO ¶ 19.

[99] JX 265 at 2–3, 133.

[100] PIPE is an acronym that stands for "private investment in public equity." Tr. 357 (Chadha).

[101] JX 215 at 61.  Under the original BCA, closing was conditioned on Quinpario providing at least $275 million in cash, which could consist of funds remaining in its trust account following redemptions coupled with proceeds from the PIPE investment. *See* JX 169 §§ 6.15, 8.1(g), 8.3(c); JX 265 at 2–3.

the BCA's closing was conditioned on Quinpario and the PIPE investors contributing at least $275 million in total (the "Cash Condition").[102] On top of these equity investments, the BCA contemplated raising $1.35 billion in new debt.[103]

## G. The Revised BCA

SourceHOV began working on the PIPE financing before signing the BCA.[104] To help satisfy the Cash Condition, (i) financial advisors working on the Business Combination agreed to invest their fees in the PIPE investment and (ii) SourceHOV obtained additional debt financing (the "Margin Loan") to generate $57.5 million of proceeds, which were also put towards the PIPE investment.[105]

To secure the Margin Loan, it was agreed that the Company's former-stockholders' merger consideration (i.e., Exela stock) would be held by a new entity, Ex-Sigma LLC ("Ex-Sigma").[106] The Margin Loan required SourceHOV to merge into a wholly-owned Ex-Sigma subsidiary immediately before the Business

---

[102] JX 265 at 2–3.

[103] *Id.* at 26, 146.

[104] JX 132.

[105] JX 265 at 3.

[106] *Id.* Ex-Sigma agreed to purchase up to $57.5 million of the total $275 million private placement of Exela's common and Series A Perpetual Convertible Preferred Stock sold in the PIPE investment. *Id.* at 188.

Combination.[107] Each share of SourceHOV stock would then convert into Ex-Sigma membership units (the "Ex-Sigma Merger").[108] During the negotiation of the Ex-Sigma Merger, Chadha and Reynolds acted on SourceHOV's behalf without an independent committee of SourceHOV directors.[109]

After the Ex-Sigma Merger, Reynolds and Chadha became Ex-Sigma's sole managers.[110] This dynamic put SourceHOV's former-minority stockholders in a particularly illiquid position. The terms of the Margin Loan require Ex-Sigma to hold its Exela stock as security until the Margin Loan is repaid.[111] And Ex-Sigma's LLC agreement gives Reynolds and Chadha full discretion to decide when, and whether, to repay the Margin Loan.[112] Taken together, Chadha and Reynolds maintained exclusive voting control over all the Exela stock SourceHOV's former

---

[107] *Id.* at 3.

[108] *Id.*

[109] Tr. 182–84 (Chadha). SourceHOV made no real effort to run a sale process. Its Board did not hold a single meeting to consider either the Ex-Sigma Merger or the Business Combination more generally. JX 316, Resp. No. 11. One of SourceHOV's financial advisors, Morgan Stanley, operated under a conflict of interest because it had served as financial advisor on prior transactions at HGM's behest, receiving $40 million in fees. JX 316, Resp. No. 13. Morgan Stanley also invested in the Business Combination. JX 236 at 13 (noting "MS" had acquired 642,860 Exela shares with two other banks).

[110] Tr. 205–06 (Chadha).

[111] Tr. 208 (Chadha).

[112] JX 99 at 34.

stockholders received in the Business Combination. In light of the new structure required to facilitate the Margin Loan, the parties to the Business Combination revised the BCA (the "RBCA") to (i) make Ex-Sigma the recipient of the former-SourceHOV stockholders' consideration, (ii) have Quinpario provide less equity and (iii) increase the PIPE financing.[113]

The Ex-Sigma Merger and the Business Combination closed in July 2017.[114] The stockholders, directors and managing members of Novitex, SourceHOV, Ex-Sigma and Exela passed written consents approving the RBCA and various financing transactions for the Business Combination.[115] Ultimately, Exela stock was distributed as follows: (i) Ex-Sigma 54.9%, (ii) Apollo 20.9%, (iii) Quinpario's stockholders 8.3%, (iv) PIPE investors 14.2% and (v) financial advisors 1.7%.[116] Based on Exela's closing stock price of $8.61 per share on July 12, 2017, the market value of the consideration provided to Ex-Sigma implies an aggregate equity value for SourceHOV of $694 million, or $4,177.10 per share.[117]

---

[113] JX 236 at 8; JX 265 at 2–4, 61; *see id.* at 58 (containing a helpful illustration of the Business Combination's structure).

[114] JX 265 at 1–4; JX 287.

[115] *Id.*

[116] JX 236 at 6.

[117] 80,600,000 Exela shares x $8.61 per share. This implies a $4,177.10 per share price for SourceHOV's stock ($694 million ÷ 166,136 SourceHOV shares).

## H. SourceHOV Revenue Projections

Because SourceHOV's growth strategy depended on buying companies, its management regularly made financial projections to facilitate acquisitions.[118] As discussed below, three sets of projections are particularly relevant to this dispute: the Equity Case, the Lender Model and the Bank Case.[119] Each set is depicted in the chart below:

| Transaction | Projection Date [1] | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|---|---|
| N/A | 2013 Rating Agency Presentation [3] | $ 555 | $ 575 | $ 596 | $ 618 | $ 693 | $ 661 | | | |
| BancTec | Sep. 26, 2014 [4] | | $ 872 | $ 976 | $1,012 | $ 1,052 | $1,087 | | | |
| TransCentra | Aug. 20, 2016 [5] | | | | $ 930 | $ 994 | $1,062 | $1,135 | $1,213 | $1,296 |
| Novitex | Nov. 2016 [6] | | | | $ 913 | $ 960 | $1,007 | $1,057 | $1,110 | $1,166 |
| | Jan. 23, 2016 **"Equity Case"** [7] | | | | | $ 927 | $ 974 | $1,022 | $1,074 | $1,127 |
| | Dec. 5, 2016 **"Bank Case"** [8] | | | | | $ 918 | $ 937 | $ 957 | $ 978 | $ 999 |
| | Mar. 20, 2017 [9] | | | | | $ 917 | $ 960 | $1,008 | $1,059 | $1,112 |
| | Mar. 21 - June 2017 **"Lender Model"** [10] | | | | | $ 911 | $ 960 | $1,008 | $1,059 | $1,112 |
| **SourceHOV Actual Results [2]** | | **$ 577** | **$ 651** | **$ 805** | **$ 789** | **$ 427** (.5 year) | | | | |

[1] Values shown in millions. [2] Actual Results taken from JX 395 at 13, 45 for 2013; JX 265 at 68 for 2014-2016; JX 292 for the first half of 2017. [3] JX 393 at 63. [4] JX 3 at 13. [5] JX 32E at "Consolidated SourceHOV" tab - Total Revenue line. [6] JX 62 (Morgan Stanley slide deck prepared as "Discussion Materials" from the "Base Case"). [7] JX 136E (at "Bank" tab); JX 158E (with Equity Case selected at "Case Selection" tab). [8] JX 158E ("Bank" tab with Bank Case selected at "Case Selection" tab). [9] JX 192 at 3. [10] JX 227 at 3.

---

[118] Tr. 107 (Verma); *see, e.g.*, JX 393 (2013 Ratings Agency Presentation); JX 158 at 17–18 (Feb. 2017 "Equity" Case); JX 227 at 3 (the "Lender Model"); JX 3 at 13 (BancTec acquisition projections).

[119] JX 158E (the Equity Case and the Bank Case are found on the "Bank" tab by toggling between Assumptions 1 and 2 on the "Case Selection" tab); JX 227 at 3 (the Lender Model).

SourceHOV primarily used the Equity Case and its derivative, the Lender Model, in its financial analyses and reporting.[120] Both models assumed revenue growth for SourceHOV at 5% per year.[121] SourceHOV management developed and "stood behind" the Equity Case, which it created along with SourceHOV's Board, sales team, operations team, investors and financial advisors through an "iterative process."[122] The Lender Model reflected a minor "haircut" to improve the accuracy of the Equity Case based on iterative feedback from SourceHOV's bankers.[123]

SourceHOV used either the 5% Equity Case or the 5% Lender Model for making investor presentations, interacting with its financial advisors, making lender pitches, reporting to credit rating agencies, making public filings and working with its accountants.[124] Indeed, at least 10 SourceHOV presentations relied exclusively on 5% growth projections.[125] In accounting memoranda, SourceHOV described

---

[120] Tr. 63, 66, 72–74, 126 (Verma).

[121] (Year 2 – Year 1) / Year 1.

[122] Tr. 14–16 (Verma); Verma Dep. (JX 338) 34.

[123] Verma Dep. (JX 338) 34–35.

[124] JX 102 at 17 (SourceHOV "Management Presentation" from January 2017); JX 100 at 4; JX 101 at 4 (presentations by Morgan Stanley and Rothschild); JX 136 at 8, 30 (presentations for lenders and ratings agencies); JX 394 (same); Tr. 58–65 (Verma) (5% models were used for presentations to potential lenders and auditors); JX 377E (same); JX 302 at 3 (discussing Rothschild's analysis); JX 173 at 37 (SEC filings incorporating the Equity Case).

[125] *See* Pet'rs' Post-Trial Answering Br. ("PPTAB") (D.I. 101) at 12–13 (citing JX 102 at 17; JX 100 at 4; JX 101 at 4; JX 136 (data room for lenders); JX 173 at 37 (public S.E.C.

these 5% models as "conservative" and sometimes labeled them as the "base model."[126]

Unlike the Equity Case and the Lender Model, the Bank Case projected approximately 2% growth for SourceHOV after 2018.[127] SourceHOV seldom used the Bank Case and did not update the model after it was created.[128]

## I. "Contemporaneous" SourceHOV Valuations

As a part of its assignment, Rothschild was asked in February 2017 to value SourceHOV's equity in a "fairness or unfair opinion."[129] Not surprisingly, Rothschild selected the oft-used 5% Equity Case revenue projections as the foundation for its work and calculated a 12% cost of capital "based on comparable companies."[130] It then incorporated these assumptions into a DCF analysis that

---

filings); JX 302 at 11 (Rothschild analysis); JX 191E; JX 191 at 11; JX 394E (credit rating agency presentation); JX 229 at 3; JX 234 at 3).

[126] Tr. 69–70, 126 (Verma); JX 377 at 5; JX 191 at 10, 13–14, 18–19, 28, 31.

[127] (Year 2 – Year 1) / Year 1.

[128] *Cf.* JX 192 (discussing Lender Model update on March 20, 2017); Verma Dep. (JX 338) 34 (same).

[129] JX 302 at 3. Rothschild's February Valuation was not a formal fairness opinion, although SourceHOV management relied on it when assessing the fairness of the Business Combination. JX 265 at 5 (no formal fairness opinion); JX 302 at 3 (Rothschild's February Valuation was used to help SourceHOV management "decide[] on fairness or unfair[ness].").

[130] JX 302 at 17.

yielded a "Standalone SourceHOV" enterprise valuation of "$2.035" billion, and an "equity value" of "$931" million (the "February Valuation").[131]  The February Valuation was the "last" valuation that Rothschild presented to the SourceHOV Board before the Business Combination.[132]  But that is not what Chadha wanted the outside world to believe.

Almost four months after this litigation began, Chadha asked his son-in-law, Andrej Jonovic (who also works at HGM), to request a "revised" valuation from Rothschild.[133]  In January 2018, Rothschild responded with a so-called "retrospective valuation update as of July 2017 . . . reflecting the final transaction structure and updated assumptions at that time" (the "Backdated Valuation").[134]  The Backdated Valuation used lower revenue growth projections (i.e., 2.4%–3.5% per year) and calculated SourceHOV's equity value at $675 million.[135]  A few days after reviewing the Backdated Valuation, Jonovic responded to Rothschild, "the

[131] *Id.*

[132] Rothschild Dep. (JX 322) 174.

[133] JX 301 at 1.

[134] JX 309 at 2.

[135] *See id.* at 10 (showing a "Discounted Cash Flow" "Total equity value" of between $451 and $994 million); 15 (showing an "Implied equity value" of $675 million); *but see* JX 302 at 12 (the February Valuation calculated a "Total equity value" based on a "Discounted Cash Flow" analysis of between $680 million and $1.29 billion), 17 (showing an "Implied equity value" of $931 million).

27

cover page says Jan 2018 . . . Happy for it to simply say July 2017."[136] After Rothschild agreed to change the date, Jonovic forwarded the Backdated Valuation to Chadha by email. The transmittal contained one word: "Done."[137]

Ultimately, the Proxy Statement for the Business Combination disclosed SourceHOV's existing equity value was $645 million based on a $644,800,000 value for the Exela shares paid to Ex-Sigma.[138] The Proxy Statement arrived at this valuation after applying a 25% "IPO discount."[139] The term "IPO discount" apparently was meant to convey that the parties valued SourceHOV's stock differently depending on whether one considered the Exela transaction on a "fully distributed" or a "pre-listing" basis.[140] The "fully distributed" value represented "the valuation [] [at which Exela] would trade [] at some point, once it's fully distributed into the market."[141] In contrast, the "pre-listing" value was "the price that investors

---

[136] JX 309 at 1.

[137] *Id.*

[138] JX 265 at 78, 101, 126.

[139] Surjadinata Dep. (JX 322) 126.

[140] *Id.*

[141] *Id.*

would receive in a regular IPO."[142]  The Proxy Statement valued SourceHOV's equity at $645 million based on the lower, pre-listing value of Exela's stock.[143]

## J. Procedural Posture

Manichaean filed its petition for appraisal under Section 262 of the Delaware General Corporation Law on September 21, 2017.[144]  It seeks appraisal for 10,304 shares of SourceHOV's common stock that were converted into Ex-Sigma membership units in the Ex-Sigma Merger.[145]  Manichaean and SourceHOV both presented expert witnesses at trial in support of their proffered views of the fair value of SourceHOV stock.  I summarize these opinions below.  Before doing so, however, I discuss certain discovery-related events that have influenced my assessment of witness credibility.

---

[142] *Id.*; JX 297 at 8 (showing a "Final Transaction Consideration" for "Standalone SourceHOV" on a "Long-Term FD" basis of $806 million but a value of $645 million on a "pre-listing" basis); JX 309 (same).

[143] JX 265 at 78.

[144] Verified Pet. for Appraisal of Stock (D.I. 1).

[145] *Id.*

### 1. Manichaean Discovers the Backdated Valuation

Respondent produced the Backdated Valuation with a date stating it was created during "July 2017," instead of 2018 when it was actually created.[146]  Later, Manichaean e-mailed Respondent's counsel requesting "other information underlying the analysis of the [Backdated Valuation]."[147]   While Respondent produced some responsive information, it did not produce the e-mails between Jonovic and Rothschild discussing the Backdated Valuation.  Instead, Respondent claimed in a sworn Interrogatory Response that "Rothschild made [a] presentation[] concerning the Merger . . . in . . . July of 2017 [during] meetings" with SourceHOV.[148]

As discovery wore on, Manichaean learned that the Backdated Valuation had actually been created in January 2018.[149]  Manichaean demanded production of the January 2018 e-mails surrounding the Backdated Valuation,[150] and Respondent finally produced the e-mails in November 2018.[151]  Yet, when Manichaean deposed

---

[146] JX 297 at 1, 3.  Current counsel for Respondent was not yet involved in the case at this stage of the discovery.

[147] JX 313 at 1.

[148] JX 316, Resp. No. 5 at 6–7.

[149] Rothschild Dep. (JX 322) 147–49.

[150] *Id.* at 152:8–19.

[151] JX 331.

Jonovic and Chadha to address these developments, they *still* maintained that the Backdated Valuation was presented to SourceHOV *before* the Business Combination closed in 2017 and that Respondent's interrogatory responses stating as much were correct.[152] It was not until the eve of trial when Respondent finally amended its Interrogatory Response to admit there was no Rothschild "July 2017" presentation.[153]

### 2. Manichaean's Expert

Before trial, Manichaean retained Timothy J. Meinhart to appraise the fair value of SourceHOV as a standalone entity immediately before the Business Combination.[154] He ultimately concluded SourceHOV's equity was worth $798.711 million or $5,079 per share.[155]

---

[152] Chadha testified that Rothschild made a presentation in July 2017 related to "the proxy and the road show with the bankers" and that SourceHOV's Interrogatory Response "sounds accurate." Chadha Dep. (JX 359) 119:14–121:11. Jonovic testified that SourceHOV's Interrogatory Response "looks correct, yes" and claimed that "Rothschild could have made a presentation over, you know, video conference" and "provided it to us in July." Jonovic Dep. (JX 337) 143:2–145:17.

[153] JX 361, Resp. No. 5 at 5.

[154] JX 350a (the "Meinhart Op.") at 4. Meinhart holds a BS in finance from Northern Illinois University, an MBA degree from the DePaul University Graduate School of Business and is an accredited senior appraiser of the American Society of Appraisers, accredited specifically in business valuation. Meinhart Op. at 5.

[155] *Id.* at 46.

In preparing his valuation, Meinhart employed three valuation methodologies: (i) DCF, (ii) Capital Cash Flow ("CCF") and (iii) Guideline Publicly Traded Company ("GPTC").[156] These approaches yielded enterprise values for SourceHOV of $1.788 billion, $1.831 billion and $2.074 billion respectively.[157] While Meinhart considered all three, he ultimately based his conclusions *only* on the DCF and CCF methods—both of which are "income approaches."[158]

DCF posits that the value of a business is the present value of the future income that will be received by the owners of a business.[159] It uses a weighted average cost of capital ("WACC") to discount the future cash flows a company's owners expect to receive.[160] A CCF is a variation of DCF that is better suited to

---

[156] *Id.* at 17–18.

[157] *Id.* at 36–40, 46.

[158] *Id.* at 18. Income approaches seek to convert a company's expected future cash flows into a single "present value." *Id.* Meinhart rejected the guideline merged and acquired company method because he could not identify any transactions involving companies sufficiently similar to SourceHOV where the transaction closed within a reasonable period before the Business Combination. *Id.* He rejected the asset accumulation method because a discrete valuation of each of the SourceHOV assets was beyond the scope of his engagement. *Id.*

[159] *Id.* at 17.

[160] *Id.*

value future cash flows where a company's capital structure is expected to change.[161]

Ultimately, a traditional DCF and CCF are "algebraically equivalent."[162]

According to Meinhart, the first step in applying either the DCF or the CCF models is to project SourceHOV's future cash flows. In this regard, he placed "primary reliance" on the Lender Model because it was (i) frequently "updated" and "circulated" before the Business Combination, (ii) "vetted" by the participants of the Business Combination and their advisors and (iii) the "most conservative" of the updated projections.[163]

Meinhart then made two adjustments to the Lender Model. *First*, he adjusted projected cash flows to include the continued amortization of goodwill.[164] *Second*, he accounted for management fees, board fees and expenses, and non-cash equity compensation expenses.[165] Both adjustments led to lower cash flows than SourceHOV management originally projected.[166]

---

[161] *Id.* (citing JX 422).

[162] JX 422 at 1–2.

[163] Meinhart Op. at 20.

[164] *Id.* at 20–21 (explaining that SourceHOV was amortizing its goodwill over a period of 10 years beginning in 2014, but changed its treatment of goodwill in 2016 in anticipation of the Business Combination, and further explaining that a reversion to a private company would probably cause a reversion to amortization of goodwill).

[165] *Id.* at 21.

[166] *Id.*

For the DCF model, Meinhart (i) projected the future cash flows to holders of SourceHOV's debt and equity using the Lender Model and (ii) applied a present value discount rate (or WACC) to those cash flows.[167] He began by converting the Lender Model into a cash flow projection that incorporated taxes, depreciation and amortization expenses, capital expenditures and changes to net working capital.[168] Next, he applied a WACC discount rate of 11.2% to SourceHOV's future cash flows to arrive at a net present value based on SourceHOV's cost of debt and equity capital.[169]

To calculate industry beta, which is one of the key inputs in a WACC calculation, Meinhart selected 19 publicly traded guideline companies and

---

[167] *Id.* at 22, 27.

[168] *Id.* at 22.

[169] *Id.* at 23, 27. To arrive at a single WACC, Meinhart calculated a cost of equity capital and a cost of debt capital separately. *Id.* at 26–27. He calculated the WACC discount rate based on the capital asset pricing model ("CAPM")—the general formula for which is: $K_e = R_f + [\beta * E_{RP}] + S_{RP}$. $K_e$ represents the cost of equity capital. $R_f$ represents the risk-free rate of return (which is based on U.S. Government debt). *Id.* $\beta$ represents the industry beta. Industry beta is a measure of the *systematic* risk of a stock. JX 420 at 8–9. It shows the tendency of a specific stock's price to correlate with changes in the broader market. Meinhart Op. at 22. $E_{RP}$ represents the equity risk premium. This is the extra return that investors demand to compensate them for investing in common stocks rather than investing in risk-free securities. $S_{RP}$ is the size-related equity risk premium. The size premium represents the empirical observation that companies of smaller size are linked to greater risk and thus have greater cost of capital. JX 426. It is needed to adjust for the size differential between a specific company and the empirical data from which the equity risk premium is derived. Meinhart Op. at 23. Meinhart applied an equity risk premium of 5.97% and a size premium of 2.08% based on the size premium table from the Duff & Phelps 2017 Valuation Handbook. *Id.* (citing JX 426).

34

calculated their "raw, levered betas."[170]   He based his selection of comparable companies on (i) SourceHOV's public filings, (ii) those identified by Rothschild in the February Valuation and (iii) his own independent research.[171]   Next, he "unlever[ed]" each specific beta to focus only on industry risk instead of the risk created "by the [guideline] company's particular capital structure."[172]   To be conservative, and to account for SourceHOV's high debt load, Meinhart "selected the highest unlevered equity betas of the guideline company group of 1.203 and 1.210."[173]  He then further increased the beta in a re-levering process to account for SourceHOV's projected capital structure.[174]

Another key input for a WACC calculation is a company's size premium.  The size premium accounts for the additional risk of investing in a smaller company compared with the broader index of companies represented in a market index.[175]

---

[170] Meinhart Op. at 25.

[171] *Id.* at 36–37.

[172] *Id.* at 25.  For the de-levering calculation, Meinhart used the "Hamada formula, the Harris-Pringle formula, and the Fernandez formula."  *Id.*  He ultimately chose the Hamada formula, even though the other formulas tended to produce lower betas, because Hamada is "widely accepted," "used by many analysts" and more commonly used "than any other re-levering model."  Tr. at 633–34 (Meinhart).

[173] Meinhart Op. at 26.

[174] *Id.*

[175] *Id.* at 23; JX 340 at 67.

As noted, Meinhart applied a size premium of 2.08% based on statistical analysis from the 2017 Duff & Phelps Valuation Handbook for companies with market capitalization between $569.279 million to $1.030 billion.[176]

For his alternative CCF model,[177] Meinhart (i) adjusted the Lender Model into a cash flow projection and (ii) considered a present value discount rate that is easier to calculate than WACC—the unlevered cost of equity capital ("UCEC").[178] To calculate the appropriate UCEC, Meinhart used the same unlevered guideline company beta of 1.21 that he used in the WACC calculation for the traditional DCF analysis. His calculations led to a 12.4% discount rate for the CCF analysis.[179]

One component of Meinhart's CCF analysis was to project SourceHOV's future interest expenses and their impact on future cash flows. He estimated the present value of SourceHOV's income tax shield based on an assumption that the

---

[176] Meinhart Op. at 23 (citing JX 426).

[177] Meinhart explained he applied the CCF model to address concerns about whether SourceHOV would be able to (i) exploit its interest expense deductions in the years in which expenses were incurred and (ii) maintain a constant capital structure where the percentages of debt and equity capital are essentially unchanged over time. *Id.* at 29.

[178] *Id.* at 31.

[179] *Id.*

Company would pay down debt at a weighted average interest rate of 9%.[180] This is in accord with the management projections SourceHOV provided to its auditors.[181]

Meinhart ultimately weighted his DCF and CCF valuations equally—yielding a SourceHOV enterprise value of $1.810 billion.[182] In reaching this conclusion, Meinhart chose not to rely on the Equity Case or his GPTC valuation.[183] He preferred the Lender Model because it was "more updated"; and he rejected the GPTC valuation because there was "not a perfect guideline company for SourceHOV."[184]

As a final step, Meinhart tweaked his valuation to account for (i) SourceHOV's cash, (ii) net operating loss carryforwards ("NOLs") and

---

[180] *Id.* at 72; Tr. 650–52, 571–77 (Meinhart).

[181] *See* JX 191E ("Debt Schedule" Tab, line 58, columns G–Z).

[182] Meinhart Op. at 41, 46.

[183] *See id.* at 41 (noting that reliance on either the Equity Case or the GPTC valuation would have yielded higher values for SourceHOV's equity).

[184] *Id.* Meinhart also considered other "indications of value." He noted that his valuation of SourceHOV's equity at $798,711 was within the range Rothschild found in the February Valuation of $527 million to $993 million. *Id.* at 42–43. He also considered the transaction price at which Delos, HGM and Manichaean purchased additional SourceHOV stock in early 2017 (implying an equity value of $231 million). *See* JX 35 at 27. Meinhart chose not to rely on these transactions because of the "conflicted nature" of the parties to the transactions and "the fact that the transaction price was well below the range of value established by SourceHOV's own financial advisor in the subsequent work it performed." Meinhart Op. at 43.

37

(iii) various sources of debt.[185]  When all was said and done, Meinhart concluded that the fair value of SourceHOV as of the Business Combination was $798 million, or $5,079 per share.[186]

### 3. Respondent's Expert

Respondent's valuation expert was Gregg Jarrell.[187]  In his report, Jarrell opined that SourceHOV's equity value was $286.4 million (or $1,723 per share).[188] He amended that view during his deposition after making certain changes that drove his valuation 63% higher than his original assessment, to $468.1 million (or $2,817 per share).[189]

Like Meinhart, Jarrell relied on a type of DCF analysis to value SourceHOV.[190]  Specifically, he relied on an adjusted present value ("APV")-based

---

[185] *Id.* at 41–42.

[186] *Id.* at 42.

[187] JX 340 ("Jarrell Op.") at 4.  Jarrell holds both a Ph.D. in Business Economics and a MBA from the University of Chicago.  Jarrell Op. at 5.  He has experience as an economics professor, an economics consultant and the Chief Economist for the Securities and Exchange Commission.  Jarrell Op. at 5.

[188] *Id.* at 4.

[189] Jarrell Dep. (JX 356) 15; JX 353 Ex. 8 (updated).  Jarrell's adjustments were prompted by Meinhart's suggestions regarding SourceHOV's projected depreciation and amortization as well as its NOL projections.  Jarrell Dep. (JX 356) 19, 21–22.

[190] Jarrell Op. at 39.

DCF model to value the projected cash flows associated with SourceHOV equity.[191]

Jarrell's APV model is functionally the same as Meinhart's CCF model.[192]  Both the APV and CCF models seek to simplify the valuation exercise for a company with a changing capital structure.[193]

Jarrell began by selecting the Equity Case as the foundation for his APV valuation.[194]  He made this selection because he wanted to be as "conservative as the expert for Respondent."[195]  Jarrell noted his "serious reservations" about the Equity Case's reasonableness based, in part, on SourceHOV management's "aggressive" accounting practices.[196]  On the other hand, he observed that Rothschild used the Equity Case projections when performing its February Valuation, which, in his mind, increases their reliability.[197]

---

[191] *See id.* at 37–38 (explaining that a traditional WACC-based DCF handles income tax savings from tax deductible interest payments by incorporating those savings directly into the WACC, while an APV model uses an unlevered cost of equity and separately values the present value of interest tax shields).

[192] Tr. 802 (Jarrell) (explaining that an APV model is "mathematically virtually identical" to a CCF model); Tr. 571 (Meinhart).

[193] Tr. 577 (Meinhart); Jarrell Op. at 41–42.

[194] Jarrell Op. at 53.

[195] *Id.*

[196] *Id.* at 50, 60.

[197] *Id.* at 53.

After applying certain adjustments to the Equity Case, he then turned to the Modigliani and Miller theorem (the "M&M Theorem") as the foundation for his discount rate.[198] That theorem posits "that the risk (beta) of the firm's debt must always be less than the risk (beta) of the firm's equity."[199] He adopted this concept as the "methodological basis for how [he] estimate[d] the unlevered cost of equity for SourceHOV."[200] Jarrell explained:

> I use the available evidence to determine the minimum reasonable cost of debt of a standalone SourceHOV as of the valuation date, which then yields an implied minimum reasonable debt beta based on this minimum reasonable cost of debt. I then conservatively use this implied debt beta as a minimum possible estimate of the overall beta of SourceHOV's assets (also called the unlevered equity beta). Because I use the APV approach, instead of the WACC approach, all I need to calculate the appropriate unlevered equity discount rate is the unlevered equity beta, which in theory cannot be less than the beta of the firm's debt as explained above.[201]

Jarrell took this approach for the same reasons that Meinhart rejected the GPTC approach.[202] SourceHOV was a private company, so the appraiser cannot

---

[198] *Id.* at 64–65; Tr. 755–57 (Jarrell) (discussing his adjustments to the Equity Case for stock-based compensation, depreciation and amortization, taxes and capital expenditures).

[199] Jarrell Op. at 65.

[200] *Id.* at 66.

[201] *Id.*

[202] *Id.*

measure equity beta directly.[203] Unlike Meinhart, however, Jarrell took the dearth of comparable companies a step further and concluded he could not use "indirect or regression-based betas . . . to estimate SourceHOV's unlevered equity beta."[204] Instead, Jarrell estimated that SourceHOV's unlevered cost of equity was 13.69% by starting with the "market-based yields for [SourceHOV's] traded debt" and plugging that value into the capital asset pricing model.[205]

Beta is one of the key inputs for a CAPM analysis. In this regard, Jarrell noted, "industry or peer group averages are commonly used when the beta of a company . . . cannot be determined."[206] Even so, based on the M&M Theorem, Jarrell chose to estimate SourceHOV's equity beta *directly* by calculating its debt beta.[207]

---

[203] *Id.*

[204] *Id.*

[205] *Id.* at 67–68 (explaining CAPM's basic formula: the cost of equity = (i) the risk-free rate plus (ii) a firm's beta multiplied by the equity risk premium plus (iii) the equity size premium). This is the same formula Meinhart used. *See* Meinhart Op. at 23.

[206] *Id.* at 69 (internal citation and quotation omitted).

[207] *Id.* at 66–70 (noting that the comparable companies Rothschild identified for the February Valuation were "of considerably greater size than SourceHOV" and that SourceHOV had "high financial leverage"). With this in mind, Jarrell looked at SourceHOV's actual debt (primarily, the First and Second Liens) to calculate debt beta. *Id.* at 71. In this regard, Jarrell reviewed all of SourceHOV's debt and determined that its average cost of debt was 11%. *Id.* He then determined the debt beta implied by an 11% cost of debt. *Id.* at 71–72.

Two other key components of Jarrell's analysis relate to SourceHOV's size premium and future interest expenses. To calculate SourceHOV's size premium, Jarrell used the same sources as Meinhart.[208] But Jarrell concluded that SourceHOV had a smaller market capitalization. Therefore, he increased SourceHOV's size premium from 2.08% (corresponding to a $569 million–$1.03 billion market capitalization) to 2.68% (corresponding to a $264 million–$568 million market capitalization).[209] He based this decision on Exela's trading prices after the Business Combination closed.[210]

To calculate the present value associated with SourceHOV's future interest expense tax deductions, Jarrell concluded that SourceHOV would pay off all of its sizable debt before 2020.[211] This assumption decreases the present value of the tax deductions.[212] Jarrell based this decision on his opinion that "the repayment of debts would likely be financed through new equity investments."[213]

---

[208] *Id.* at 74 (citing JX 426).

[209] *Id.* at 75–76.

[210] *Id.*

[211] *Id.* at Ex. 7.

[212] *Id.*

[213] *Id.* at 79.

After calculating the present value of SourceHOV's future cash flows, Jarrell made adjustments for NOLs, amortization, interest tax shields and debt.[214] Ultimately, he determined SourceHOV's total equity value was $468.1 million or $2,817 per share.[215] He reached this final determination, laudably, after incorporating input from Meinhart and adopting portions of Meinhart's expert opinion that he found persuasive.[216] Even with the adjustments, however, the experts' fair value determinations miss each other by ~44%.

## II. ANALYSIS

After considering all relevant factors, I have determined the fair value of SourceHOV as of the Business Combination was $4,591 per share. I reach this conclusion in four steps. *First*, I review the legal standards and burdens of proof applicable in a statutory appraisal proceeding. *Second*, I summarize the unique factors that have led me to conclude that DCF is the only reliable method to reach SourceHOV's fair value. *Third*, given the wide divergence between the parties' litigation positions, I assess the credibility of each expert's analysis at the macro level to determine the extent to which their opinion is dispositive, or informative,

___

[214] *Id.* at 97.

[215] Jarrell Dep. (JX 356) 15; JX 353 Ex. 8 (updated).

[216] Jarrell Dep. (JX 356) 15.

43

of fair value.[217] *Fourth*, upon determining that Meinhart, on behalf Manichaean, has presented a credible valuation opinion, I discharge my independent obligation to determine SourceHOV's fair value by reviewing the record to assess whether there are opportunities for the Court to improve upon what Meinhart has done.[218]   With one minor exception, I see no basis in the evidence to depart from Meinhart's calculations.

## A. The Statutory Appraisal Remedy

The Delaware appraisal statute "provide[s] equitable relief for shareholders dissenting from a merger on grounds of inadequacy of the offering price."[219] The statute directs the court to:

> *determine the fair value of the shares* exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation, together with interest, if any, to be paid upon the amount

---

[217] *Cede & Co. v. Technicolor, Inc.*, 884 A.2d 26, 35–36 (Del. 2005) ("*Cede III*") (observing that "[i]t is often the case in statutory appraisal proceedings that a valuation dispute becomes a battle of experts . . . present[ing] [] conflicting expert testimony" and "[t]he Court of Chancery, as the finder of fact in an appraisal case, enjoys the unique opportunity to examine the record and assess the demeanor and credibility of witnesses" as "the sole judge of the credibility of live witness testimony") (internal quotations omitted).

[218] *See, e.g.*, *In re Appraisal of Jarden*, 2019 WL 3244085 (finding that neither valuation expert had presented an entirely credible DCF valuation and, therefore, undertaking a separate analysis).

[219] *Cede & Co. v. Technicolor, Inc.*, 542 A.2d 1182, 1186 (Del. 1988) (*"Cede I"*).

determined to be the fair value. In determining such fair value, the Court shall take into account *all relevant factors*.[220]

"Fair value," in the statutory appraisal context, "is not equivalent to the economic concept of fair market value."[221] Rather, it is "a jurisprudential concept" that seeks to calculate "the value of the company as a going concern, rather than its value to a third party as an acquisition."[222] When assessing fair value, Delaware courts have understood that the statutory direction to consider "all relevant factors" mandates consideration, at least, of "all generally accepted techniques of valuation used in the financial community."[223] Even so, our Supreme Court has made clear that statutory appraisal is a "flexible process" that vests the Court of Chancery with "significant discretion" to determine fair value.[224] In exercising this discretion, the court may "select one of the parties' valuation models as a general framework, or fashion its own."[225]

---

[220] 8 *Del. C.* § 262(h) (emphasis supplied).

[221] *Merion Capital L.P. v. Lender Processing Servs., Inc.*, 2016 WL 7324170, at *13 (Del. Ch. Dec. 16, 2016) (quotation and citation omitted).

[222] *Del. Open MRI Radiology Assoc., P.A. v. Kessler*, 898 A.2d 290, 310 (Del. Ch. 2006); *M.P.M. Enters., Inc. v. Gilbert*, 731 A.2d 790, 795 (Del. 1991).

[223] *Cede I*, 542 A.2d at 1186–87 (citing *Weinberger v. UOP, Inc.*, 457 A.2d 701, 712–13 (Del. 1983)).

[224] *Golden Telecom*, 11 A.3d at 218.

[225] *Cede & Co. v. Technicolor, Inc.*, 684 A.2d 289, 299 (Del. 1996) (*"Cede II"*).

In the unique creature that is a Delaware appraisal trial, both parties "bear the burden of establishing fair value by a preponderance of the evidence, which effectively means that neither party has the burden, and the burden instead falls on this court."[226] Over the years, the court has not been shy about expressing its exasperation with the task of sifting through complex financial data to reach a fair value determination, particularly when the parties' valuation experts, who ostensibly are meant to "help the trier of fact,"[227] view their roles, instead, as advocates.[228] This frustration was on full display in *Gonsalves v. Straight Arrow Publishers, Inc.*, where Chancellor Allen was tasked with determining the fair value of Straight Arrow

---

[226] *In re Appraisal of Ancestry.com, Inc.*, 2015 WL 399726, at *16 (Del. Ch. Jan. 30, 2015) (citing *Huff Fund Inv. P'ship v. CKX, Inc.*, 2013 WL 5878807, at *9 (Del. Ch. Nov. 1, 2013); *Highfields Capital, Ltd. v. AXA Fin., Inc.*, 939 A.2d 34, 42–43 (Del. Ch. 2007) ("[I]f neither party adduces evidence sufficient to satisfy this burden, the court must then use its own independent judgment to determine fair value.")). Each party's burden *includes* the burden of proving the propriety of their proffered valuation method. *Merion Capital*, 2016 WL 7324170, at *12 (internal citations omitted).

[227] Del. R. Evid. 702.

[228] *See, e.g.*, *In re Orchard Enters., Inc.*, 2012 WL 2923305, at *18 (Del. Ch. July 18, 2012) ("As a law-trained judge who has to come up with a valuation deploying the learning of the field of corporate finance, I choose to deploy one accepted method as well as I am able, given the record before me [of competing expert testimony] and my own abilities."); *In re Emerging Commc'ns Inc. S'holders Litig.*, 2004 WL 1305745, at *11 (Del. Ch. May 3, 2004) (comparing petitioners' valuation at $41 per share with respondent's valuation of $10.38 per share and noting that "[t]hese wildly differing valuations of the same company result from quite different financial assumptions that each sponsoring [expert] exhorts this Court to accept").

Publishers, Inc.[229]   Having seen in pretrial submissions that the experts were light

years apart in their appraisals, Chancellor Allen quipped that he was inclined to take

a "temperamental approach . . . [by] accept[ing] one expert or the other hook, line

and sinker."[230]   While the trial court's comment clearly was intended to express a

fact-finder's frustration, our Supreme Court took the comment literally when

Chancellor Allen ultimately decided that one of the experts, in fact, had presented a

credible analysis of fair value and accepted that opinion as his own.[231]

On appeal, the Supreme Court reversed and remanded upon concluding that

the trial court erred when it made a "pretrial decision to adhere to, and rely upon, the

methodology and valuation factors of one expert *to the exclusion of other relevant*

*evidence*."[232]   The Supreme Court was particularly concerned that the trial court

stated before the trial (likely in jest) that it intended to listen to the evidence, pick an

---

[229] *Gonsalves I*, 1996 WL 696936, at *1.

[230] *Gonsalves II*, 701 A.2d at 358 (emphasis supplied).

[231] *Id.*

[232] *Id.* (emphasis supplied).

expert and call it a day.[233]  According to the Supreme Court, this approach was "at odds" with Section 262's command "that the Court 'shall appraise' fair value."[234]

While the Supreme Court took issue with the trial court's pretrial comments, it was careful to explain, "the selection of one expert to the total exclusion of another is [not], in itself, an arbitrary act."[235] The Court acknowledged that, even in appraisal cases, the Court of Chancery should assess expert testimony under the "usual standards which govern the receipt of such evidence."[236] Since *Gonsalves*, the Supreme Court has acknowledged, "the Court of Chancery's role as an independent appraiser does not necessitate a judicial determination that is completely separate and apart from the valuations performed by the parties' expert witnesses."[237] Indeed, as long as the trial court "carefully consider[s] whether the evidence supports the valuation conclusions advanced by the parties' respective experts," "it is entirely proper for the [court] to adopt any one expert's model, methodology, and

---

[233] *Id.* at 361 ("[T]he nub of the present appeal is not merely that the Chancellor made an uncritical acceptance of the evidence of [one expert] but that he *announced in advance* that he intended to choose between absolutes."); *id.* (holding that such a pre-determination established an impermissible "evidentiary construct").

[234] *Id. See also id.* at 358, 360 (emphasizing that that the Court of Chancery must "employ its own acknowledged expertise" and not "exclu[de]" any "relevant evidence").

[235] *Id.* at 361.

[236] *Id.*; *Cede III*, 884 A.2d at 35 ("[T]he Court of Chancery is the sole judge of the credibility of live witness testimony.") (internal quotation omitted).

[237] *M.G. Bancorporation*, 737 A.2d at 525–26.

mathematical calculations, *in toto*, if that valuation is supported by credible evidence and withstands a critical judicial analysis on the record."[238]

## B. DCF Is the Only Reliable Means By Which to Appraise SourceHOV

In fulfilling the statutory mandate to account for "all relevant factors" bearing on "fair value," Delaware courts consider a range of evidence that often includes (i) "market evidence," such as a company's unaffected trading price or the "deal price" following an appropriate "market check"[239] and (ii) "traditional valuation techniques,"[240] such as a comparable company, comparable transaction or DCF analysis.[241] In this case, however, the parties and their experts agree that the

---

[238] *Id.* at 526 (emphasis in original) (citing *Cede II*, 684 A.2d at 299; *Gonsalves II*, 701 A.2d at 361–62). The parties here both acknowledge, as a general matter, that it is proper for the trial court to accept the opinion of a valuation expert in its entirety, to the exclusion of other evidence of fair value, even in the statutory appraisal paradigm. Importantly, they also agree that this is a proper case for the Court to take that approach. Of course, they disagree on which of the experts has offered the definitive fair value appraisal of SourceHOV. Post-Trial Oral Arg. (D.I. 109) at 30–37, 65–68.

[239] *Dell, Inc.*, 177 A.3d at 27–30.

[240] *Cede I*, 542 A.2d at 1186–87 (noting that *Weinberger* directs that the trial court consider traditional valuation techniques if relevant to fair value); *Highfields Capital*, 939 A.2d at 37 (describing DCF as a "traditional valuation methodology").

[241] *Cede II*, 684 A.2d at 297; *see, e.g.*, *Merion Capital*, 2016 WL 7324170, at *14 (considering deal price); *Dell, Inc.*, 177 A.3d at 5 (considering, among other factors, unaffected stock price and a DCF analysis); *In re Appraisal of Dole Food Co., Inc.*, 114 A.3d 541, 550 (Del. Ch. 2014) (listing factors the court often considers such as market price, merger price, other offers for the company, prices at which knowledgeable insiders sold their shares, internal corporate documents and valuation work prepared for non-litigation purposes).

49

circumstances surrounding the Business Combination disqualify market evidence as reliable inputs for a fair value analysis.[242] Accordingly, the valuation presentation from both sides focused on DCF. In my view, that focus was well placed.

SourceHOV's deal process (or lack thereof) undermines any reliance on deal price as an indicator of fair value.[243] Moreover, as a private company, SourceHOV's equity was not traded in an efficient market, so its unaffected market price is also an unreliable indicator of fair value.[244] Without reliable market evidence of fair value,

---

[242] JX 346 at 4 (summarizing points of agreement). *See also* Post-Trial Oral Arg. (D.I. 109) at 55, 103; Meinhart Op. at 43 (rejecting certain pre-Business Combination transactions because they were "conflicted"); Jarrell Op. at 1 (basing his estimation of fair value "primarily" on a DCF analysis). *See Dell, Inc.*, 177 A.3d at 22 ("In some cases, it may be that a single valuation metric is the most reliable evidence of fair value and that giving weight to another factor will do nothing but distort that best estimate.").

[243] SourceHOV did not hold a single Board meeting to consider the Business Combination, nor did it solicit offers from third parties after Quinpario made its overture in January 2017. Tr. 210 (Chadha); *see, e.g.*, *Dell, Inc.*, 177 A.3d at 5–13 (reviewing a deal process to assess whether deal price was a persuasive indicator of fair value); *In re Appraisal of AOL Inc.*, 2018 WL 1037450, at *8 (Del. Ch. Feb. 23, 2018) (inquiring whether a sale process was "*Dell* Compliant"); *Merion Capital*, 2016 WL 7324170, at *16–18 (reviewing a board's sale process when considering the "persuasiveness of the initial merger consideration" as an indicator of fair value).

[244] Tr. 870 (Jarrell) (SourceHOV had "no publicly traded stock prices"); JX 419 (debt pricing services observed incorrect and incomplete information regarding SourceHOV's debt); Tr. 496–97 (Cascarilla) (SourceHOV's stock "isn't traded on any exchange."); *see, e.g.*, *Merion Capital*, 2016 WL 7324170, at *14 (noting that trading prices can be persuasive indicators of fair value when pricing data is available from a "thick and efficient market") (internal citation omitted). Respondent does point to SourceHOV's conversations with Madison Dearborn Partners ("MDP") regarding an October 18, 2016, term sheet contemplating a $100 million investment into SourceHOV (valuing SourceHOV at $275–355 million) as some "market evidence" of fair value. RPTOB at 5, 16–17 (citing JX 45). I disagree. Contemporaneous documents reveal that the MDP discussions

50

the parties were left to focus on "traditional valuation methods" to appraise SourceHOV.[245] This, of course, places the spotlight squarely on their competing valuation experts. In other words, as I see it, this case has played out as the quintessential "battle of the experts."

Both experts agree there are no sufficiently comparable companies or transactions with which to perform either a trading multiples or a transaction multiples analysis.[246] Given that other valuation techniques do not fit here, both experts also agree that a DCF analysis is the only reliable method to calculate SourceHOV's fair value.[247] In light of the experts' agreement, and seeing no reason to disagree, I am satisfied that a DCF analysis is the only reliable indicator of SourceHOV's fair value.[248]

---

were, at best, preliminary and did not proceed into anything meaningful because MDP simply "couldn't move as quickly" as Exela. *See* JX 431 at 1.

[245] Jarrell Op. at 4–5 (concluding that a DCF is the only "reliable indicator of value" for SourceHOV); Meinhart Op. at 18 (same).

[246] Jarrell Op. at 4–5, 101–08; Meinhart Op. at 18; JX 346 at 4 ("[B]oth [experts] reject trading and transaction multiples as an indication of SourceHOV's value."); Tr. 677–78 (Meinhart).

[247] JX 346 at 4 (sub-point C).

[248] *See Owen v. Cannon*, 2015 WL 3819204, at *16 (Del. Ch. June 17, 2015) (exclusively relying on a DCF analysis when "[t]he parties' post-trial briefing focused exclusively on the use of a . . . DCF analysis").

## C. Respondent's Fair Value Presentation Is Not Credible

While the experts agree that DCF is the most reliable means to appraise SourceHOV, they, and others who have undertaken a DCF analysis with respect to SourceHOV, all reach remarkably divergent fair value conclusions. A summary of the DCF values in the record appears in the chart below:

| Valuation | Revenue Projection Used | Total Equity Value | Per Share Value |
|---|---|---|---|
| Respondent's Litigation Position[249] | Bank Case[250] | $271.4 million | $1,633 |
| Jarrell's Opinion (Respondent's expert)[251] | Equity Case[252] | $468.1 million | $2,817 |
| Rothschild's Backdated Valuation[253] | 3.4% model[254] | $675 million | N/A |
| The Court's Determination of Fair Value | Lender Model | $722 million | $4,591 |
| Meinhart's Opinion (Manichaean's expert)[255] | Lender Model[256] | $798 million | $5,079 |
| Rothschild's February Valuation [257] | Equity Case[258] | $931 million | N/A |

[249] RPTOB at 1.

[250] *Id.* at 46.

[251] Jarrell Op. at 4.

[252] *Id.* at 50–51. Jarrell's ultimate conclusion is not in his opinion because he adjusted his opinion after incorporating feedback from Meinhart. *See* Jarrell Dep. (JX 356) 15; JX 353 at Ex. 8 (updated).

[253] JX 309 at 15.

[254] The Backdated Valuation applied a separate 3.4% growth model that falls in between the Bank Case and the Equity Case / Lender Model. *See id.*

[255] Meinhart Op. at 4–5.

[256] *Id.* at 20.

[257] JX 302 at 17.

[258] *Id.*

52

Before drilling down on the elements of the experts' competing analyses, it is appropriate first to dilate on what is an important consideration in any adversarial proceeding—even appraisal litigation—credibility.[259] Who presented the more credible witnesses; who presented the more credible case? After carefully considering the evidence, I find Respondent's presentation lacked credibility for three main reasons: (i) Respondent disagreed with its own expert over which revenue projections to use in the DCF analysis and ultimately separated from its expert with respect to SourceHOV's fair value; (ii) Chadha, one of Respondent's key witnesses, was not at all forthright in explaining the circumstances surrounding the creation of the Backdated Valuation; and (iii) Jarrell's bespoke approach to calculating SourceHOV's beta lacks foundation, both within the expert valuation community and the facts of record.

## 1. Respondent Disagrees With Its Own Expert

Both experts, Meinhart and Jarrell, agree that either the Lender Model or the Equity Case are the best revenue projections to use in a SourceHOV DCF

---

[259] Post-Trial Oral Arg. (D.I. 109) at 30–37, 65–68; *Cede III*, 884 A.2d at 35–36 (acknowledging the importance of the trial court's assessment of "the demeanor and credibility of witnesses" in an appraisal proceeding); *M.G. Bancorporation*, 737 A.2d at 525–26 (holding that even though the court has a role as an "independent appraiser," it may "adopt any one expert's model, methodology, and mathematical calculations" if they are "supported by credible evidence and withstand[] a critical judicial analysis").

valuation.[260]  They used these forecasts because SourceHOV itself relied on them when working with its auditor, financial advisors and debt rating agencies in the period before the Business Combination.[261]  Indeed, the Lender Model was the most up-to-date set of projections created before the Business Combination.[262]

Notwithstanding this persuasive evidence of reliability, Respondent disagrees with its own expert and insists that the Bank Case is the best projection of SourceHOV's future cash flows.[263]  Thus, in its zeal to reach a desired litigation outcome, Respondent finds itself in the awkward position of advancing a position at odds with its own expert and advisor, Jarrell and Rothschild.[264]

SourceHOV's relatively poor performance in 2016 is not a sufficient reason to ignore multiple experts' opinions regarding likely future performance in favor of

---

[260] Jarrell Op. at 50, 53; Meinhart Op. at 19–20.

[261] Tr. 71–74 (Verma); JX 191 (providing Ernst & Young projections for a going concern memo); JX 191E (FCF-Base Model); Tr. 48–50 (Verma) (confirming SourceHOV provided Ernst & Young 5% revenue growth projections); JX 302 at 11 (the February Valuation using the Equity Case); JX 394 at 1 (sending the Lender Model to rating agencies); Jarrell Op. at 53 (observing that Rothschild used the Equity Case in its analysis); JX 136E ("Working Cap" tab, "SourceHOV Standalone"); Tr. 32–35 (Verma) (explaining that the Equity Case projections were provided to certain lenders before the Business Combination).

[262] Tr. 17 (Verma) (the Lender Model was a "haircut" on the Equity Case.); Tr. 567, 686 (Meinhart).

[263] *See* RPTOB at 46; Tr. 752–53 (Jarrell).

[264] *See* Jarrell Op. at 50; JX 302 at 11 (the February Valuation assuming 5% growth in 2018–2021).

the seldom-used Bank Case (which projects only 2.2% revenue growth per year).[265] SourceHOV's compound annual revenue growth was 10.1% from 2014 until just before the Business Combination.[266] Unlike Respondent's recently minted litigation position, the Equity Case and the Lender Model were not created as convenient afterthoughts. SourceHOV's management created both models after engaging in a robust "iterative process" that ultimately allowed them to "st[and] behind" the work they did to create them.[267]

In any event, Respondent engaged an expert to opine on the most accurate revenue projections for SourceHOV.[268] For his own calculations, he selected the Equity Case.[269] Respondent's willingness to continue to argue for the Bank Case— even when its own expert rejected those projections—renders its overall presentation substantially less credible.[270]

---

[265] RPTOB at 46–49; Resp't's Post-Trial Answering Br. ("RPTAB") (D.I. 100) at 18; Jarrell Op. at 47.

[266] JX 275 at 35.

[267] Tr. 14–16 (Verma).

[268] Jarrell Op. at 50, 53.

[269] *Id.*

[270] On this topic, I note that Meinhart enhances his credibility by *decreasing* management's projections for Board-related expenses, stock-based compensation expenses and aggressive depreciation projections (thus lowering the level of SourceHOV's projected income). Tr. 582–83 (Meinhart); Tr. 777, 787 (Jarrell) (Meinhart cured "an important defect [in management's] projections" for depreciation and capital expenditures). *See also* Tr. 760 (Jarrell) (acknowledging the Lender Model had "advantages" over the other

## 2. Chadha's Trial Testimony Was Not Credible

Chadha was the centerpiece of Respondent's effort to paint the picture of a company in trouble in order to lay foundation for its argument that SourceHOV's fair value was substantially south of Manichaean's fair value mark. Indeed, according to Chadha: (i) SourceHOV's equity was worthless;[271] (ii) MDP turned down an investment in SourceHOV because it did not think the Company's equity was worth $257 million;[272] (iii) SourceHOV was totally shut out from the debt markets;[273] and (iv) all strategies to keep SourceHOV afloat, other than the Business Combination, were hopeless.[274]

But Chadha simply was not believable. His litigation-driven effort to persuade Rothschild to create the Backdated Valuation to appear as if it had been

---

revenue forecasts because they "were more current" and "reflected feedback from [] lenders," "the parties" and "Apollo"). Jarrell testified he was "not qualified to second-guess [management]" on the Equity Case, and he did not think that management's aggressive accounting tactics "ruin[] the projections" or require him to "go in and undo" management's work. Tr. 769 (Jarrell). *See also* Tr. 775, 786 (Jarrell) (testifying there "should be a high standard for concluding that the projections are . . . not reasonable enough to use for a DCF").

[271] Tr. 216 (Chadha).

[272] RPTOB at 16–17 (citing Tr. 339–40 (Chadha)).

[273] *Id.* at 65 (citing Tr. 384–85 (Chadha)).

[274] *Id.* at 15–19 (citing Tr. 322, 341, 335–36, 339–43 (Chadha)). Chadha also described the Business Combination as a "miracle." Tr. 368 (Chadha).

prepared before the Business Combination was bad enough.[275]  His failure even to acknowledge that scheme, when it was finally exposed in discovery, taints all of his testimony.[276]

### 3. Jarrell's Novel Approach To Determine SourceHOV's Beta Undermines His Credibility

Perhaps the most consequential point of disagreement between the experts is the appropriate method for calculating SourceHOV's equity beta.[277]  Meinhart calculated SourceHOV's beta *indirectly* based on 19 publicly traded comparable companies;[278] Jarrell estimated SourceHOV's beta *directly* using the yields and interest rates on the First and Second Liens.[279]  Meinhart's methodology is generally accepted among valuation experts and finds direct support in academic literature,

---

[275] Tr. 279–82 (Chadha); JX 301; JX 309 (Chadha receiving an email where Jonovic told Rothschild "the cover page says Jan 2018 . . . Happy for it to simply say July 2017"); JX 309 (Jonovic reporting back to Chadha with a single word when Rothschild finally agreed to remove all references to 2018—"Done").

[276] JX 316, Resp. No. 5 at 6–7.  It is also worth noting that Respondent's litigation position (i.e., that SourceHOV's equity was worth $271 million) is a far cry from Rothschild's Backdated Valuation (which valued SourceHOV's equity at $675 million).  *See* JX 309 at 15.

[277] Tr. 809–10, 814 (Jarrell); JX 346 at 21–22; JX 343 at 13–19.

[278] Meinhart Op. at 24–26, 36–37; Tr. 597–98 (Meinhart).

[279] Jarrell Op. at 71 (Jarrell also considered, among other factors, the stated interest rates on Exela's acquisition financing); Tr. 868–69 (Jarrell).

while Jarrell's alternative method, by his own admission, does not.[280] Jarrell employed his methodology because, in his view, it fit the facts. In other words, nothing "connects" this expert's "opinion evidence . . . to existing data" except "the *ipse dixit* of the expert."[281] That Jarrell was so willing to go out on a limb to support a forensic valuation opinion, of course, raises serious admissibility issues under *Daubert.*[282] It also raised serious questions about the credibility of his entire valuation analysis.

Not only is Jarrell's approach to estimating Beta methodologically novel, it also starves for want of support in the record. Beta is a measure of the systematic risk of a stock—that is the tendency of a stock's price to correlate with changes in the market.[283] Valuation experts calculate beta in two ways: (i) directly through a regression analysis of a public company's stock prices and the market or

---

[280] Tr. 826–30 (Jarrell); Tr. 597–98, 659 (Meinhart).

[281] *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

[282] *See M.G. Bancorporation*, 737 A.2d at 521 (adopting as Delaware law the United States Supreme Court's seminal opinion in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), where the Court addressed the trial court's discretion to exclude unreliable expert testimony under the federal counterpart to DRE 702).

[283] JX 420 at 8–9. The "market" is typically represented by a broad-based equity index that includes a wide range of industries. *Id.* at 3. The market's beta is 1.0 by definition. A company with a beta equal to 1 has the same risk as the market (it theoretically moves up and down with the market *in tandem*). A company with a beta greater than 1 is riskier than the market (i.e., it theoretically moves up and down to a *greater* degree than the market). *Id.*

(ii) indirectly by proxy.[284]   But direct calculation is impossible when the target company is privately held.[285]   Indeed, Jarrell admitted that "[a] stack of books" supports the proposition that one "need[s] to use a *proxy beta* when the subject business is . . . closely held."[286]   Even so, Jarrell was undeterred.

Using the courtroom as incubator for his experiment, Jarrell proceeded to calculate SourceHOV's equity beta *directly* by looking to market evidence of SourceHOV's debt.[287]   In doing so, Jarrell abandoned the traditional, indirect, beta approximation method because he did not believe there were public companies sufficiently comparable to SourceHOV.[288]   Instead, he employed his novel approach,

---

[284] JX 420 at 2–4.

[285] Tr. 809, 867–68 (Jarrell); JX 420 at 5–6 ("You need to use a proxy beta when the subject business is a division, reporting unit, or closely held business.").

[286] Tr. 829 (Jarrell) (emphasis supplied); *see* JX 343 at 16–19 (Meinhart's rebuttal report discussing Jarrell's methodology); JX 420; JX 423 at 3–8; Tr. 634 (Meinhart); Rothschild Dep. (JX 322) 240 ("[T]his is a private firm, generally, so you have to infer what investors would require as a cost of equity from publicly-traded, quote, unquote, 'peers.'").

[287] Jarrell Op. at 68.  *See* Steven J. Breyer, *Introduction to Reference Manual on Scientific Evidence*, FED. JUD. CTR., at 4 (3d Ed. 2011) (observing, in the context of *Daubert*, that "the courtroom is not a laboratory"); *Minner v. Amer. Mort. & Guarantee Co.*, 791 A.2d 826 (Del. Super. Ct. 2000) (Quillen, J.) ("[T]here are important differences between the quest for truth in the courtroom and the quest for truth in the laboratory.") (citation omitted).

[288] Tr. 809–10 (Jarrell).

59

which he admitted he had "not seen" or "done" before.[289] Jarrell "thought of [his method] for this case" and hoped that it would "catch on" in the future.[290]

I do not foreclose the possibility that Jarrell's method will "catch on" after proper vetting by his peers. If it does, perhaps then this court might be persuaded. For now, however, I am not inclined to ignore the "stack of books" to chase Respondent's proffer of a shiny new penny.[291]

Another, more fundamental, problem with Jarrell's approach is his reliance on SourceHOV's debt yields as market evidence of SourceHOV's actual cost of debt.[292] Jarrell looked to the weighted average yield to maturities of the First and Second Liens, both at their issuance and their subsequent trading prices, to determine SourceHOV's cost of debt.[293] The problem with this approach is that SourceHOV's

---

[289] Tr. 828 (Jarrell); Tr. 624 (Meinhart) (The comparable company method is the "preferred method for estimating a beta when you're valuing a privately held company.").

[290] Tr. 828 (Jarrell).

[291] The Court is ill-equipped to assess the merits of the theoretical debate in which Jarrell and Meinhart engaged regarding novel implications of the M&M Theorem for beta approximation, much less who will ultimately prevail should the debate continue in the academy where it belongs. Jarrell admits his theory is new and that Meinhart's approach is tried and tested. Tr. 828–29 (Jarrell); Tr. 667–71 (Meinhart). As lay fact finder, I place my trust in the generally accepted methodology.

[292] Jarrell Op. at 31, 71 (considering the current yield to maturity on the First and Second Liens ranging from 8.48% to 17.96% based on Bloomberg data).

[293] *Id.*

debt was not publicly traded.[294]  The First and Second Liens were private loans that traded only by appointment.[295]  And, at least once, Bloomberg reported prices on SourceHOV bonds that no longer existed.[296]  Thus, even if Jarrell's approach were sound in theory, his flawed execution does not engender confidence in the results.[297]

This leaves the traditional, indirect method Meinhart employed to approximate SourceHOV's equity beta.  Respondent takes issue with Meinhart's beta calculation on two grounds.  *First*, it argues Meinhart's calculation is unreliable because he derived SourceHOV's beta from public companies that are not comparable to SourceHOV in terms of industry or market focus.[298]  *Second*, and

---

[294] Jarrell Dep. (JX 356) 47–53.

[295] *Id.*; Tr. 472–76 (Cascarilla).

[296] Jarrell Dep. (JX 356) 47–53; JX 419 (debt pricing services listed incorrect and incomplete information for SourceHOV's debt).

[297] In its Answering Brief, Respondent stresses that Jarrell only considered the flawed Bloomberg data as "confirmatory" evidence for his assessment of SourceHOV's cost of debt.  *See* RPTAB at 37.  Respondent argues Jarrell primarily considered the yield to maturity on the First and Second Liens.  *Id.*  Ultimately, I find Respondent has failed to present enough credible evidence to support the conclusion that the yield to maturity on the First and Second Liens accurately represents SourceHOV's cost of debt.  Respondent cites Meinhart's testimony that considering the yield to maturity on a company's debt is "one of the ways to look at [cost of debt]."  *Id.* at 33–34 (citing Tr. 717–18 (Meinhart)).  But this is a far cry from the firm evidentiary foundation that would be required to conclude that the yield to maturity on the First and Second Liens reflected the Company's "actual cost of debt, in an efficient market, full stop."  *See* JX 427 at 3 (warning against "using the debt yield as [a company's] cost of capital" because "[w]hen the firm's debt is risky, [] the debt yield will overestimate the debt cost of capital").

[298] RPTOB at 52–55.

relatedly, Respondent says Meinhart's portfolio contained companies that were less levered and much larger than SourceHOV.[299] These criticisms do not shake my confidence in Meinhart's valuation methodology.

As for comparability, Meinhart used many of the same comparable companies that SourceHOV, its accountants and Rothschild used in their own beta calculations before the Business Combination.[300] While there may be some imprecision associated with indirect beta estimates, it is generally accepted that when a company is privately held, a comparable companies analysis is the best tool available to derive beta, even if the comparable companies are larger or less levered.[301] Jarrell does not dispute this fact.[302]

Betas for any specific stock incorporate two risk factors: business (or operating) risk and financial (or capital structure) risk.[303] By starting with a comparable company's beta and removing the effect of financial leverage (i.e., unlevering the beta), the appraiser is left only with the effect of business risk,

---

[299] *Id.* at 52; RPTAB at 38; JX 346 at 23–24.

[300] Tr. 600–08 (Meinhart); Meinhart Op. at 64.

[301] Tr. 629–39 (Meinhart); JX 420 at 4–6; JX 423 at 8–13.

[302] Tr. 828–29 (Jarrell).

[303] JX 420 at 8.

which can then be used to estimate the business risk of the target company.[304]  While this process necessarily invites some measurement error, appraisers decrease the risk of error by employing a large pool of comparable companies, as Meinhart did in his analysis.[305]  Indeed, the valuation authorities relied upon by the parties, and in the record, recommend the exact de-levering process Meinhart employed as the best way to adjust for differences in leverage between the target company and the comparable companies.[306]

Both experts considered the Pratt and Grabowski text's discussion of de-levering betas.[307]  It provides:

> If the leverage of . . . [a] closely held company subject to valuation differs significantly from the leverage of the guideline public companies selected for analysis . . . it typically is desirable to remove the effect that leverage has on the betas before using them as a proxy to estimate the beta of the subject company.[308]

---

[304] *Id.* at 8–9.

[305] Meinhart Op. at 36–37; Tr. 637 (Meinhart); Tr. 704–07 (Meinhart) (discussing his statistical analysis of SourceHOV's comparable companies).

[306] JX 420 at 8–9.

[307] Tr. 634, 638 (Meinhart); Jarrell Op. at 68 n.201.

[308] JX 420 at 9.  Meinhart acknowledged that SourceHOV was smaller than his selected comparable companies, but he also included a size premium in his analysis.  *See* Meinhart Op. at 23 (discussing his use of a size premium to "adjust for the size differential between SourceHOV and the empirical data from which the equity risk premium is derived").

This is exactly what Meinhart did.[309] After applying widely accepted de-levering formulas, Meinhart chose the highest beta in his analysis to adjust for the possibility that the de-levering and re-levering process underestimated SourceHOV's beta.[310] Given Meinhart's conservative execution of widely accepted beta approximation methods, his beta value is both reasonable and credible, while Jarrell's admittedly novel process does not survive judicial scrutiny—at least not on this record.

*****

Jarrell's presentation stood out as untethered to accepted methods and generally not credible. Since Respondent's fair value position rested on Jarrell's opinion,[311] its fair value proffer suffers the same flaws. In other words, Respondent has failed to prove its valuation position by a preponderance of the evidence.[312]

Respondent maintains that Meinhart's appraisal substantially overvalues SourceHOV. I address those criticisms below.

---

[309] Meinhart Op. at 24–25.

[310] Tr. 638–39 (Meinhart); Meinhart Op. at 26.

[311] As noted, at trial, Respondent started with its expert's conclusions and then endeavored to adjust them downward to reach a lower fair value for SourceHOV.

[312] *Highfields Capital*, 939 A.2d at 42.

**D. Meinhart's Fair Value Opinion Is Both Credible and Reasonable**

Respondent has identified five areas where Meinhart's DCF inputs are flawed: (1) debt load projections, (2) depreciation and amortization projections, (3) the appropriate set of SourceHOV financial statements to use in a DCF analysis, (4) the total shares of SourceHOV stock outstanding before the Business Combination and (5) the appropriate size premium to apply in a CAPM analysis.[313] I address each input below.

### 1. Debt Load Projections

When employing either the CCF or APV model, the appraiser must calculate the net present value of a company's income tax shields using reliable projections of the company's future debt load.[314] Without an accurate projection of future debt, it is impossible accurately to predict tax savings.[315] Meinhart assumed SourceHOV would carry significant debt past the year 2020.[316] Jarrell, on the other hand,

---

[313] Meinhart and Jarrell use the risk-free rate of return and the same equity risk premium. Tr. 809 (Jarrell).

[314] *See* Tr. 571–74 (Meinhart).

[315] *Id.*

[316] *See, e.g.*, Meinhart Op. at 59.

predicted that SourceHOV would have to refinance all of its debt—leading to lower tax savings from interest deductions.[317]

Rather than create his own forecasts, Meinhart based his projection on SourceHOV management's own forecasts.[318] These forecasts predicted SourceHOV would continue to carry debt even after SourceHOV repaid the First and Second Liens.[319] Contrary to Respondent's criticism, Meinhart did not ignore SourceHOV's high leverage ratios. He recognized SourceHOV's high debt loads were stressing the Company. Accordingly, he assumed SourceHOV would "try[] to reduce debt as rapidly as it could."[320]

For his part, Jarrell assumed SourceHOV would retire 100% of its debt in 2020 when SourceHOV repaid the First and Second Liens.[321] When considered in context with the entire record, Jarrell's assumption is not reasonable. Given SourceHOV's acquisitive history, and its past tolerance for high debt loads, it is

---

[317] Tr. 654 (Meinhart); Tr. 837 (Jarrell).

[318] Tr. 645 (Meinhart); Meinhart Op. at 59 (incorporating debt projections from the Lender Model).

[319] Tr. 654, 571–74 (Meinhart); JX 75E (Nov. 2016 "Debt Schedule" tab, line 58, columns G–Z); JX 191E (March 2017 "Debt Sheet" Tab, line 81 columns H–AI); JX 211E.

[320] Tr. 575 (Meinhart). Respondent argues that SourceHOV would have been cut off from the debt markets when the First and Second Liens matured. *See* RPTOB at 65. Respondent cites testimony from Chadha for this proposition. RPTOB at 65 (citing Tr. 384 (Chadha)). As discussed above, Chadha was not credible.

[321] Tr. 571–74 (Meinhart); Tr. 837 (Jarrell).

unlikely SourceHOV would have abruptly abandoned its strategy of using debt to fuel future acquisitions.[322] Management's projections realistically forecast that SourceHOV would continue to carry debt after the First and Second Liens matured.[323] Meinhart's reliance upon these projections was reasonable and supported by credible evidence.

## 2. Depreciation and Amortization Projections

In his analysis, Meinhart recognized that SourceHOV management had forecast "very high depreciation and amortization and relatively low capital expenditures."[324] This forecast led to "depreciating and amortizing more asset value than [SourceHOV] even ha[d] on the books."[325] If Meinhart had accepted this high level of depreciation and amortization (as Jarrell did), the result would have been to *increase* SourceHOV's value in a DCF analysis.[326] Instead, to account for his concern that depreciation and amortization forecasts were too high, Meinhart made

---

[322] Tr. 306 (Chadha) ("[A]lmost all" of SourceHOV's later acquisitions were funded with 100% debt.).

[323] JX 75E (Nov. 2016 "Debt Schedule" tab, line 58, columns G–Z); JX 191E (March 2017 "Debt Sheet" Tab, line 81 columns H–AI); JX 211E.

[324] Tr. 585 (Meinhart).

[325] *Id.*

[326] *See* Jarrell Op. at 60 (accepting management's "very aggressive" reinvestment rates).

a Respondent-friendly adjustment to provide a more accurate calculation.[327] Once he made this adjustment, Jarrell, in large measure, followed suit.[328]

Even though Respondent and its expert abandoned their own depreciation and amortization calculations in favor of Meinhart's, they criticize his approach for treating certain asset depreciation values as tax deductible when the tax code would treat them as non-deductible.[329] Meinhart responds by arguing that SourceHOV did not produce a "tax basis runout" of its assets before he prepared his expert report.[330] Thus, while Meinhart would have preferred to begin with tax basis instead of book basis when preparing his depreciation and amortization schedules, that option was not available to him.[331] Accordingly, he used the same available book values and corresponding projections that SourceHOV, itself, had created and used for its own forecasts.[332] Again, this was the only data made available to him.

---

[327] Meinhart Op. at 20–21.

[328] *See* Jarrell Dep. (JX 356) 15; JX 353 at Ex. 8 (updated).

[329] *See* RPTOB at 49–51.

[330] Tr. 588 (Meinhart); Jarrell Dep. (JX 356) 36 (confirming SourceHOV did not produce a full set of contemporaneous documents showing the full tax basis of its goodwill and other assets).

[331] Tr. 588 (Meinhart).

[332] Meinhart Op. at 20–21; Tr. 589–90, 593 (Meinhart).

In his rebuttal report, Jarrell "recalculated [Meinhart's] D&A Projections, but replace[d] [Meinhart's] forecasted total goodwill with just the portion of goodwill that is tax deductible."[333] Meinhart objects to Jarrell's recalculation, and for good reason. Tax basis accounting and book basis accounting involve fundamentally different rules.[334] The appraiser should analyze *either* book depreciation *or* tax depreciation since the two numbers can be vastly different.[335] I reject Jarrell's argument that the "default rule" should be that goodwill is not tax deductible.[336] Allowing Respondent to modify Meinhart's book basis depreciation runouts would reward the lack of information flow between the parties and give an unreasonable inference to SourceHOV.[337]

Jarrell's effort to do a *tax* analysis on *book* values, in my view, is not reasonable. I am persuaded Meinhart's depreciation and amortization projections are the best-available forecasts. Indeed, Petitioners' point that Meinhart's

---

[333] JX 346 at 14.

[334] Tr. 587–88 (Meinhart); JX 373; Jarrell Dep. (JX 356) 37–38. Jarrell admits he did not consider or assess whether other intangible assets subject to depreciation and amortization (such as tradenames) were tax deductible and that he is "way out of [his] league with accounting questions." Jarrell Dep. (JX 356) 38.

[335] Tr. 589–93 (Meinhart) (explaining the nuances of a tax depreciation runoff schedule that made him "uncomfortable with the mixing" and why he "decided to stick with [his] schedule").

[336] Tr. 874–75 (Jarrell).

[337] Jarrell Dep. (JX 356) 36–37 (SourceHOV did not produce tax documents).

calculation "is the only full book-basis *or* tax-basis calculation provided by either party" is well taken.[338]  I find Meinhart's approach to be both reasonable and supported by credible evidence.

### 3.  The Selection of Appropriate Financial Statements and Forecasts

The parties dispute which SourceHOV financial statements and forecasts most accurately project the Company's future cash flows.[339]  For his calculations, Meinhart used SourceHOV's balance sheet, cash flow and net debt financial information as of March 31, 2017, because, as a practical matter, these results were the last SourceHOV numbers available before the Business Combination.[340] Multiple sources corroborate the reasonableness of Meinhart's choice.

*First*, SourceHOV's management represented that, as of July 12, 2017, there were no more updated financial statements than those Meinhart used in his analysis.[341]  *Second*, on July 11, 2017, SourceHOV also told its auditor that it only had "best estimates" for May and June income statements.[342]   *Third*, when

---

[338] PPTAB at 63 (emphasis supplied).

[339] Tr. 656, 681–83 (Meinhart); JX 346 at 15–16.

[340] Meinhart Op. at 21, 47–51; Tr. 654–56, 686 (Meinhart).

[341] JX 411 (management confirming that "n[o] consolidated financial statements are available as of any date or for any period subsequent to March 31, 2017.").

[342] JX 378 at 2.

Rothschild performed its Backdated Valuation for litigation purposes, it used the same financial statements as Meinhart.[343]

On the other hand, Respondent asks the Court to rely on second-quarter information that was not realistically available until about a month after the Business Combination closed.[344] While second-quarter data may have *existed* before July 12, on this record, I find Meinhart's decision to use the March 31 financial statements both reasonable and supported by credible evidence.[345]

### 4. The Correct Calculation of Total Outstanding Shares

It is undisputed SourceHOV's fully "diluted" share count at the time of the Business Combination was 157,249.[346] But the parties disagree over whether SourceHOV's Restricted Stock Units ("RSUs") should be included in the count of total outstanding shares. This disagreement is important because if the RSUs are included in the count, then the effect is to dilute the holdings of existing stockholders, including Petitioners.[347] In his analysis, Meinhart did not count any of

[343] JX 308 at 4 (considering "net debt figures as of March 31, 2017").

[344] JX 292 (Exela 8-K releasing second quarter financial statements on August 9, 2017); RPTOB at 66–67.

[345] Tr. 539–40 (Reynolds) (admitting that "it usually takes time" to prepare financial statements after a quarter ends and that financial statements are not "instantaneously" available).

[346] JX 292 at 5; JX 265 at 68.

[347] JX 346 at 61.

SourceHOV's 8,887 RSUs granted under the Company's Long-Term Incentive Plan (the "Plan") because, in his view, whether *vel non* those RSUs would vest was, at best, speculative.[348]

According to the Plan, the holder must be alive, not disabled and employed with the Company in order to convert her RSUs.[349] It is undisputed that at least 1,192 of the unvested RSUs were forfeited within 5 months of the Business Combination and over 10,000 were forfeited from 2014–16.[350] Given this history, Meinhart's reluctance to count the RSUs in the share count was justified.

### 5. The Applicable Size Premium

The parties agree that applying a size premium is appropriate and that it should be determined using Duff & Phelps' 2017 Valuation Handbook, which provides size premiums based on market capitalization.[351] But, of course, the parties dispute SourceHOV's market capitalization at the time of the Business Combination and, therefore, the experts disagree on the appropriate size premium.[352] Meinhart

---

[348] Tr. 734–35 (Meinhart); JX 343 at 24.

[349] JX 265 at 428–29; JX 383 §§ 11(a) at 11–12, 12(a)(ii) at 12, 13(a) at 14.

[350] Tr. 543–44 (Reynolds); JX 385 at 105; JX 265 at 429–30.

[351] RPTOB at 58 (citing Tr. 690 (Meinhart)). As noted, a size premium accounts for the additional risk of investing in a smaller company compared with the broader index of companies represented in a market index. Meinhart Op. at 23; Jarrell Op. at 67.

[352] *Compare* Jarrell Op. at 74–78 (using decile 9 and a size premium of 2.68%), *with* Meinhart Op. at 23 (using decile 8 and a size premium of 2.08%).

determined SourceHOV's market capitalization using Exela's stock price just after the Business Combination and Rothschild's analyses of SourceHOV's share of the consideration in the Business Combination.[353] Based on Exela's $8.61 per share stock price on July 12, 2017, and Rothschild's calculations in the February Valuation, Meinhart concluded SourceHOV's market capitalization was greater than $569.279 million.[354] This puts SourceHOV in Duff & Phelps' "8th decile"— yielding a size premium of 2.08%.[355]

On the other hand, Jarrell considered a post-closing decrease in Exela's stock price to determine the applicable size premium.[356] Specifically, one week after the Business Combination, Exela released an 8-K disclosing that many Quinpario stockholders had elected to redeem their shares rather than participate in the Business Combination.[357] In response, Exela's stock price decreased to $6.98 per

---

[353] Meinhart Op. at 23–24; JX 302 at 12 (showing Rothschild's February Valuation calculating SourceHOV's merger consideration between $806 million and $1.003 billion); JX 309 at 10 (showing Rothschild's Backdated Valuation valuing SourceHOV's merger consideration between $645 million and $806 million).

[354] Meinhart Op. at 23–24 (citing JX 302 at 12).

[355] *Id.*

[356] Tr. 835–36 (Jarrell).

[357] JX 288.

share on July 19, implying a $563 million value for SourceHOV—below the $569 million market capitalization threshold for decile 9.[358]

Ultimately, Jarrell chose the 2.68%, decile 9, size premium for two reasons. *First*, the trading activity on July 19 reflected the market's informed reaction to Quinpario's redemptions, an outcome that was *knowable* before the Business Combination.[359]  *Second*, the market price of the Exela stock SourceHOV received in the Business Combination necessarily overstates SourceHOV's value because it includes synergies arising from the Business Combination.[360]

After reviewing both parties' arguments related to the applicable size premium, I find that both sides have presented reasonable arguments for either the 2.08% or the 2.68% size premiums.  But I am persuaded the 2.68% size premium is more accurate on this record.  In reaching this conclusion, I am cognizant that selecting the applicable size premium requires some circularity since its main input (market capitalization) is usually a strong indicator of a company's fair value.[361]

---

[358] *See* Jarrell Op. at 26–27, 75 (considering Exela's stock price on July 19, 2017 and August 10, 2017).

[359] Jarrell Op. at 75–77; *In re Appraisal of AOL*, 2018 WL 1037450, at *10 (citations omitted).

[360] Tr. 836 (Jarrell); Jarrell Op. at 76.

[361] *See Market Capitalization*, Merriam-Webster (Dec. 31, 2019, 10:59 AM), https://www.merriam-webster.com/dictionary/market%20capitalization (defining market

I am also aware that I am selecting a market capitalization for size premium purposes that contradicts my ultimate determination of SourceHOV's fair value. But, on this record, both experts applied a size premium based on Exela's post-Business Combination stock price.[362] The question becomes which expert's assumptions were more reliable and a better reflection of SourceHOV's operative reality. Between the two experts' approaches, I am persuaded a 2.68% size premium is more accurate given that it incorporates information that was knowable as of the Business Combination.

**E. SourceHOV's Fair Value and The Court's Independent Burden**

After reviewing the parties' evidentiary presentations and arguments in the context of the entire record, I determine SourceHOV's fair value immediately before the Business Combination was $4,591 per share.[363] This valuation incorporates my judgment that Meinhart's DCF model accurately reflects SourceHOV's fair value. After carefully reviewing the analysis, I adopt it *in toto*, except for my adjustment to the applicable size premium. I reach this conclusion after considering whether there are any additional adjustments to Meinhart's DCF valuation that are justified in the

---

capitalization as a company's "current stock price" multiplied by its total "shares outstanding"); Jarrell Op. at 72 n.244 (same).

[362] Jarrell Op. at 75; Meinhart Op. at 23.

[363] I arrive at this number by modifying the size premium Meinhart applied in his calculations. *See* JX 351E; Appendix 1–3 (attached to this Opinion).

record.[364] After applying my own "critical judicial analysis," I see no basis to tinker with the careful analysis of a valuation expert whose testimony I have found to be credible and whose conclusions are well supported by the evidence.[365]

## III. CONCLUSION

For the foregoing reasons, I have found the fair value of SourceHOV as of the Business Combination was $4,591 per share. The legal rate of interest, compounded quarterly, shall accrue from the date of the Business Combination's closing to the date of payment. The parties shall confer and submit an implementing order and final judgment within ten days.

---

[364] *See M.G. Bancorporation*, 737 A.2d at 526–27.

[365] *Id.* at 526.

# APPENDIX 1

| EXHIBIT 11a |
|---|
| **SOURCEHOV HOLDINGS, INC.** |
| **DISCOUNTED CASH FLOW METHOD** |
| **WEIGHTED AVERAGE COST OF CAPITAL** |
| **AS OF JULY 12, 2017** |

| | | | | | |
|---|---|---|---|---|---|
| **Cost of Equity Capital:** | | | | | |
| | | | | | |
| **Modified Capital Asset Pricing Model:** | | | | | |
| | | | | | |
| Risk-Free Rate of Return [a] | | 2.65% | | 2.65% | 2.65% |
| | | | | | |
| General Equity Risk Premium [b] | | 5.97% | | 5.97% | 5.97% |
| Multiplied by: Industry Beta (rounded) [c] | | 1.37 | | 2.46 | 2.02 |
| Industry-Adjusted General Equity Risk Premium | | 8.18% | | 14.69% | 12.06% |
| | | | | | |
| Size Equity Risk Premium [d] | | 2.68% | | 2.68% | 2.68% |
| Indicated Cost of Equity Capital | | 13.51% | | 20.02% | 17.39% |
| | | | | | |
| **Selected Cost of Equity Capital (rounded)** | | 13.5% | | 20.0% | 17.4% |
| | | | | | |
| | | | | | |
| **Cost of Debt Capital:** | | | | | |
| | | | | | |
| Before-Tax Cost of Debt Capital | | 4.42% [e] | | 9.73% [f] | 9.73% [f] |
| Income Tax Rate [g] | | 37.0% | | 37.0% | 37.0% |
| | | | | | |
| **Selected Cost of Debt Capital (rounded)** | | 2.8% | | 6.1% | 6.1% |
| | | | | | |
| | | | | | |
| **Weighted Average Cost of Capital Calculation:** | | | | | |
| | | | | | |
| Selected Cost of Equity Capital | | 13.5% | | 20.0% | 17.4% |
| Multiplied by: Equity/Invested Capital (rounded) | | 83.0% [h] | | 37.9% [i] | 48.5% [j] |
| Equals: Weighted Cost of Equity Capital | | 11.2% | | 7.6% | 8.4% |
| | | | | | |
| Selected Cost of Debt Capital | | 2.8% | | 6.1% | 6.1% |
| Multiplied by: Debt/Invested Capital (rounded) | | 17.0% [h] | | 62.1% [i] | 51.5% [j] |
| Equals: Weighted Cost of Debt Capital | | 0.5% | | 3.8% | 3.1% |
| | | | | | |
| | | | | | |
| **Weighted Average Cost of Capital (rounded)** | | **11.7%** | | **11.4%** | **11.6%** |
| | | | | | |
| **Selected Weighted Average Cost of Capital** | | **11.6%** | | | |

Definitions are presented in Schedule A.

[a] 20-year U.S. Treasury bond, *Federal Reserve Statistical Release*, as of July 12, 2017.

[b] Duff & Phelps, *2017 Valuation Handbook: U.S. Guide to Cost of Capital*.

[c] As presented in Exhibit 13, Hamada relevered beta.

[d] Duff & Phelps, *2017 Valuation Handbook: U.S. Guide to Cost of Capital*, 8th size decile.

[e] Moody's Baa corporate bond yield as of July 12, 2017.

[f] S&P high yield CCC corporate bond yield as of July 12, 2017.

[g] Based on the Company-provided expected income tax rate of 37 percent. See ROTHSCHILD00107, Excel file and SHOV-QP-00036116.

[h] Based on the median capital structure of the guideline publicly traded companies. See Exhibit 12.

[i] Based on SourceHOV estimated pre-listing equity value of $645 million and debt as of March 31, 2017, of $1,055 million.

[j] Based on SourceHOV estimated fully distributed equity value of $1,003 million and debt as of December 31, 2016, of $1,064 million.

Sources: As indicated above.

# APPENDIX 2

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | **EXHIBIT 11b** | | | | | | |
| | | **SOURCEHOV HOLDINGS, INC.** | | | | | | |
| | | **CAPITAL CASH FLOW METHOD** | | | | | | |
| | | **PRETAX WEIGHTED AVERAGE COST OF CAPITAL** | | | | | | |
| | | **AS OF JULY 12, 2017** | | | | | | |
| **Cost of Equity Capital:** | | | | | | | | |
| **Modified Capital Asset Pricing Model:** | | | | | | | | |
| Risk-Free Rate of Return [a] | | 2.65% | | 2.65% | | 2.65% | | |
| General Equity Risk Premium [b] | | 5.97% | | 5.97% | | 5.97% | | |
| Multiplied by: Industry Beta (rounded) [c] | | 1.37 | | 2.46 | | 2.02 | | |
| Industry-Adjusted General Equity Risk Premium | | 8.18% | | 14.69% | | 12.06% | | |
| Size Equity Risk Premium [d] | | 2.68% | | 2.68% | | 2.68% | | |
| Indicated Cost of Equity Capital | | 13.51% | | 20.02% | | 17.39% | | |
| **Selected Cost of Equity Capital (rounded)** | | 13.5% | | 20.0% | | 17.4% | | |
| **Cost of Debt Capital:** | | | | | | | | |
| Before-Tax Cost of Debt Capital | | 4.42% | [e] | 9.73% | [f] | 9.73% | [f] | |
| Income Tax Rate [g] | | - | | - | | - | | |
| **Selected Cost of Debt Capital (rounded)** | | 4.4% | | 9.7% | | 9.7% | | |
| **Weighted Average Cost of Capital Calculation:** | | | | | | | | |
| Selected Cost of Equity Capital | | 13.5% | | 20.0% | | 17.4% | | |
| Multiplied by: Equity/Invested Capital (rounded) | | 83.0% | [h] | 37.9% | [i] | 48.5% | [j] | |
| Equals: Weighted Cost of Equity Capital | | 11.2% | | 7.6% | | 8.4% | | |
| Selected Cost of Debt Capital | | 4.4% | | 9.7% | | 9.7% | | |
| Multiplied by: Debt/Invested Capital (rounded) | | 17.0% | [h] | 62.1% | [i] | 51.5% | [j] | |
| Equals: Weighted Cost of Debt Capital | | 0.7% | | 6.0% | | 5.0% | | |
| **Pretax Weighted Average Cost of Capital (rounded) [l]** | | **12.0%** | | **13.6%** | | **13.4%** | | |
| **Unlevered Cost of Equity Capital:** | | | | | | | | |
| Risk-Free Rate of Return [a] | | 2.65% | | | | | | |
| General Equity Risk Premium [b] | | 5.97% | | | | | | |
| Multiplied by: Industry Beta (rounded) [k] | | 1.21 | | | | | | |
| Industry-Adjusted General Equity Risk Premium | | 7.2% | | | | | | |
| Size Equity Risk Premium [d] | | 2.68% | | | | | | |
| Indicated Cost of Equity Capital | | 12.55% | | | | | | |
| **Concluded Unlevered Cost of Equity Capital (rounded)** | | **12.6%** | | | | | | |
| **Selected Pretax Weighted Average Cost of Capital** | | **12.9%** | | | | | | |

Definitions are presented in Schedule A.
[a] 20-year U.S. Treasury bond, *Federal Reserve Statistical Release*, as of July 12, 2017.
[b] Duff & Phelps, *2017 Valuation Handbook: U.S. Guide to Cost of Capital*.
[c] As presented in Exhibit 13, Hamada relevered beta.
[d] Duff & Phelps, *2017 Valuation Handbook: U.S. Guide to Cost of Capital*, 8th size decile.
[e] Moody's Baa corporate bond yield as of July 12, 2017.
[f] S&P high yield CCC corporate bond yield as of July 12, 2017.
[g] Income tax rate is eliminated to arrive at a pretax weighted average cost of capital.
[h] Based on the median capital structure of the guideline publicly traded companies. See Exhibit 12.
[i] Based on SourceHOV estimated pre-listing equity value of $645 million and debt as of March 31, 2017, of $1,055 million.
[j] Based on SourceHOV estimated fully distributed equity value of $1,003 million and debt as of December 31, 2016, of $1,064 million.
[k] As presented in Exhibit 13, highest unlevered beta of the guideline companies.
[l] The unrounded pretax weighted average cost of capital ranged from 11.455 percent to 13.376 percent.
Sources: As indicated above.

# APPENDIX 3

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | **EXHIBIT 1** | | | | | |
| | | **SOURCEHOV HOLDINGS, INC.** | | | | | |
| | | **VALUATION SUMMARY** | | | | | |
| | | **AS OF JULY 12, 2017** | | | | | |

| Valuation Method | Exhibit Reference | Indicated Business Enterprise Value $000 | Relative Emphasis | Weighted Value $000 |
|---|---|---|---|---|
| Management Projections—Discounted Cash Flow Method | 8a | 1,911,000 | 0% | - |
| Management Projections—Capital Cash Flow Method | 8b | 1,841,000 | 0% | - |
| Lender Model Projections—Discounted Cash Flow Method | 10a | 1,715,000 | 50% | 857,500 |
| Lender Model Projections—Capital Cash Flow Method | 10b | 1,751,000 | 50% | 875,500 |
| Market Approach—Guideline Publicly Traded Company Method | 15 | 2,074,000 | 0% | - |
| | | | 100% | |
| Business Enterprise Value before Adjustments | | | | 1,733,000 |
| | | | | |
| Plus: Cash and Cash Equivalents [a] | 2 | | | 15,916 |
| Plus: Value of Net Operating Loss Carryforwards | 16b | | | 50,381 |
| Less: Interest-Bearing Debt | 2 | | | (1,055,115) |
| Less: After-Tax Pension Liability [b] | 2 | | | (18,026) |
| Less: Long-Term Tax Liability | 2 | | | (3,063) |
| Less: Other Long-Term Liabilities less Other Assets | 2 | | | (1,239) |
| | | | | (1,011,146) |
| | | | | |
| Fair Value of Equity | | | | 721,854 |
| | | | | |
| Fair Value of Equity | | | | 721,854 |
| Total Common Shares Outstanding (000) [c] | | | | 157.249 |
| Per-Share Fair Value of Equity ($, rounded) | | | | 4,591 |

Definitions are presented in Schedule A.

[a] Equates to all unrestricted cash and cash equivalents.

[b] Estimated as the pension liability of $28.612 million less income taxes at a rate of 37 percent.

[c] Total shares outstanding as of June 30, 2017, per Exela Technologies, Inc., SEC Form 8-K/A filed August 9, 2017. SourceHOV had 157,243 shares outstanding as of March 31, 2017, per the Notice, F-76.

Sources: As indicated above and Willamette Management Associates estimates and calculations.